**Hearing Date:  July 21, 2015 at 10:00 a.m. (ET)**
**Objection Deadline:  July 14, 2015 at 4:00 p.m. (ET)**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Old Carco Liquidation Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11
                                              :
Old Carco LLC                                 :    Case No. 09-50002 (SMB)
(f/k/a Chrysler LLC), et al.,¹                :
                                              :    (Jointly Administered)
                         Debtors.             :
                                              :
-------------------------------------------------------------x
```

**NOTICE OF HEARING ON MOTION OF OLD CARCO LIQUIDATION TRUST**
**FOR THE ENTRY OF A FINAL DECREE, PURSUANT TO SECTION 350**
**OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3022 AND**
**LOCAL BANKRUPTCY RULE 3022-1, (A) CLOSING THE CHAPTER 11**
**CASES OF OLD CARCO LLC AND ALPHA HOLDING LP,**
**(B) TERMINATING THE APPOINTMENT OF THE CLAIMS AND NOTICING**
**AGENT, (C) GRANTING RELEASES AND (D) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

       1.       Attached hereto as <u>Annex A</u> is *the Motion of Old Carco Liquidation Trust*

*for the Entry of a Final Decree, Pursuant to Section 350 of the Bankruptcy Code, Bankruptcy*

*Rule 3022 and Local Bankruptcy Rule 3022-1, (A) Closing the Chapter 11 Cases of Old*

---

[1]     A second amended list of the Debtors, their addresses and tax identification numbers is filed at Docket
No. 3945 and can also be found at <u>www.chryslerrestructuring.com</u>.

*Carco LLC and Alpha Holding LP, (B) Terminating the Appointment of the Claims and Noticing*

*Agent, (C) Granting Releases and (D) Granting Related Relief* (the "<u>Motion</u>").

        2.      A hearing on the Motion is scheduled to occur before the Honorable Stuart

M. Bernstein, United States Bankruptcy Judge, on **July 21, 2015 at 10:00 a.m., Eastern Time**,

in Courtroom 723, United States Bankruptcy Court, One Bowling Green, New York, New York

10004.

        3.      Objections, if any, to the Motion must:  (a) be made in writing;

(b) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United

States Bankruptcy Court for the Southern District of New York; (c) be filed with the Court not

later than **4:00 p.m., Eastern Time, on July 14, 2015** (the "<u>Objection Deadline</u>"); (d) be

received in Judge Bernstein's Chambers, United States Bankruptcy Court, Room 723,

One Bowling Green, New York, New York 10004, by the Objection Deadline; and (e) be served

in accordance with the provisions of General Order M-182 so as to be actually received, not later

than the Objection Deadline, by counsel to Old Carco Liquidation Trust at  Jones Day,

1420 Peachtree Street, N.E., Suite 800, Atlanta, Georgia 30309 (Attn:  Jeffrey B. Ellman, Esq.).

Objections not served and filed on or before the Objection Deadline may not be considered by

the Court.

        4.      Copies of papers filed in these cases may be obtained from the Court's

website at http://ecf.nysb.uscourts.gov or, free of charge, at www.chryslerrestructuring.com.

Dated:  June 18, 2015
        New York, New York

  s/  Corinne Ball
Corinne Ball
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR
OLD CARCO LIQUIDATION TRUST

## ANNEX A

**Hearing Date:  July 21, 2015 at 10:00 a.m. (ET)**
**Objection Deadline:  July 14, 2015 at 4:00 p.m. (ET)**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Old Carco Liquidation Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re                                                       :      Chapter 11
                                                            :
Old Carco LLC                                               :      Case No. 09-50002 (SMB)
(f/k/a Chrysler LLC), *et al.*,[1]                          :
                                                            :      (Jointly Administered)
                          Debtors.                          :
                                                            :
------------------------------------------------------------x

**MOTION OF OLD CARCO LIQUIDATION TRUST FOR
THE ENTRY OF A FINAL DECREE, PURSUANT TO SECTION 350
OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3022 AND LOCAL
BANKRUPTCY RULE 3022-1, (A) CLOSING THE CHAPTER 11 CASES
OF OLD CARCO LLC AND ALPHA HOLDING LP, (B) TERMINATING
THE APPOINTMENT OF THE CLAIMS AND NOTICING AGENT,
(C) GRANTING RELEASES AND (D) GRANTING RELATED RELIEF**

---

[1]        A second amended list of the Debtors, their addresses and tax identification numbers is filed at Docket
No. 3945 and can also be found at www.chryslerrestructuring.com.

TO THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE:

Old Carco Liquidation Trust (the "Liquidation Trust"), as successor in interest to

Old Carco LLC (f/k/a Chrysler LLC) ("Old Carco") and its affiliated debtors in the

above-captioned cases (collectively, the "Debtors"), respectfully represents as follows:

## General Background

1.    On April 23, 2010, the Court entered the *Order Confirming the Second

Amended Joint Plan of Liquidation of Debtors and Debtors in Possession*, *as Modified* (Docket

No. 6875) (the "Confirmation Order").  The Confirmation Order confirmed the *Second Amended

Joint Plan of Liquidation of Debtors and Debtors in Possession*, *as Modified*, which was

attached to the Confirmation Order as Annex I (without exhibits thereto) and was further

modified by the *Order*, *Pursuant to Section 1127(b) of the Bankruptcy Code*, *Approving

Technical Modification of Confirmed Second Amended Joint Plan of Liquidation of Debtors and

Debtors in Possession*, *as Modified*, dated April 28, 2010 (Docket No. 6923) (collectively and

including all exhibits thereto, the "Plan").[2]

2.    The Plan became effective in accordance with its terms on April 30, 2010

(the "Effective Date").  On the Effective Date, the Liquidation Trust was established pursuant to

and in accordance with the Plan for the purpose of, among other things:  (a) liquidating

the Debtors' assets that were transferred to the Liquidation Trust (collectively, the "Liquidation

Trust Assets"); (b) distributing the proceeds of the Liquidation Trust Assets among

the beneficiaries of the Liquidation Trust; and (c) otherwise implementing the Plan.  For

purposes of the issues addressed in this Motion, the Liquidation Trust is the successor in interest

to the Debtors.

---

[2]    Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

3.       Approximately three months after the Effective Date, on July 21, 2010,

the Liquidation Trust filed the *Motion, Pursuant to Section 350 of the Bankruptcy Code,*

*Bankruptcy Rule 3022 and Local Bankruptcy Rule 3022-1, for a Final Decree (A) Closing*

*Chapter 11 Cases of 24 Debtors and (B) Approving Procedures to Close the Chapter 11 Case of*

*Alpha Holding LP* (Docket No. 7289) (the "2010 Case Closing Motion").  On August 4, 2010,

the Court entered an order (Docket No. 7317) (the "2010 Final Decree") granting the relief

requested in the 2010 Case Closing Motion.  Following the entry of the 2010 Final Decree, only

the chapter 11 cases of Debtors Old Carco (Case No. 09-50002) and Alpha Holding LP

("Alpha") (Case No. 09-50025) have remained open.  This Motion seeks to close these two

remaining cases.

### Jurisdiction

4.       This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. §§ 157 and 1334 and Article VIII of the Plan.  This is a core proceeding pursuant to

28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

5.       Pursuant to section 350 of the Bankruptcy Code, Bankruptcy Rule 3022

and Rule 3022-1 of the Local Rules of the United States Bankruptcy Court for the Southern

District of New York (the "Local Bankruptcy Rules"), the Liquidation Trust seeks the entry of a

final decree (the "Final Decree"):  (a) closing the chapter 11 cases of Debtors Old Carco and

Alpha,[3] subject to an express reservation of the Liquidation Trust's right to reopen either or both

---

[3]        The procedures for closing the Alpha case approved in the 2010 Final Decree contemplated that Alpha
would be dissolved.  However, Alpha was not dissolved, and instead was abandoned pursuant to the *Order,*
*Pursuant to Section 554 of the Bankruptcy Code, Bankruptcy Rule 6007 and Local Bankruptcy*
*Rule 6007-1, Authorizing the Abandonment of Old Carco Liquidation Trust's Ownership Interests in*
*Nondebtor Bonsol Holding S.a.r.l.* (Docket No. 8359) (approving the abandonment of the Liquidation
Trust's equity ownership in an entity through which the Liquidation Trust owned Alpha).  In any event,

cases; (b) terminating the appointment of the claims and noticing agent in these cases, Epiq

Systems, Inc. (f/k/a Epiq Bankruptcy Solutions, LLC) ("Epiq"); (c) confirming that the

Liquidation Trust Parties are released and exculpated pursuant to the Liquidation Trust Party

Release (as such terms are defined below); and (d) granting certain related relief.

## Facts Relevant to the Relief Requested

***The Liquidation Trust's Work to Complete
the Administration and Implementation of the Plan***

6.      Under the Plan, the primary activities of the Liquidation Trust include

the preservation, administration and liquidation of the Liquidation Trust Assets and

the distribution of the proceeds thereof among the beneficiaries of the Liquidation Trust.[4]

See, e.g., Plan at § IV.B.3.a.

7.      On the Effective Date, the Liquidation Trust Assets were comprised of a

diverse group of tangible and intangible assets, including, among other things, cash, vehicles, tax

receivables, prepaid deposits, several parcels of real property, machinery and equipment and

certain claims and causes of action.  The Liquidation Trust Assets as of the Effective Date are

identified more specifically in Exhibit X.A.143 to the Plan and Exhibit B to the Liquidation

Trust Agreement.

8.      The Liquidation Trust has worked since the Effective Date to complete

the administration and implementation of the Plan, as summarized below and further detailed in

the Liquidation Trustee's final report attached hereto as Exhibit A and incorporated herein by

reference (the "Final Report").

---

requesting to close Alpha's chapter 11 case by this Motion is consistent with the Alpha case closing
procedures set forth in the 2010 Final Decree.

[4]     The primary beneficiaries of the Liquidation Trust with respect to the available Liquidation Trust Assets
have been (a) the lender parties to the DIP Credit Agreement (collectively, the "Government DIP Lenders")
and (b) the Debtors' prepetition first lien secured lenders (collectively, the "First Lien Lenders").

9.      Over the past four and a half years, the Liquidation Trust has substantially completed the complex activities needed to fulfill its purposes to administer the Plan.  These activities have included, among other things:  (a) resolving Secured, Administrative and Priority Claims, including Priority Tax Claims, that were not resolved before the Effective Date;[5] (b) preserving, administering and monetizing (or, where burdensome, abandoning) Liquidation Trust Assets; (c) addressing certain environmental matters associated with real property owned by the Liquidation Trust; (d) prosecuting or defending contested matters and adversary proceedings involving the Liquidation Trust and resolving various other disputes between the Liquidation Trust and interested parties;[6] (e) successfully defending appeals of orders of this Court to the United States District Court for the Southern District of New York (the "District Court") and the United States Court of Appeals for the Second Circuit; (f) completing tax filings and collecting tax refunds; (g) maintaining estate books and records; (h) managing the cash in the Liquidation Trust's possession; (i) preparing and filing U.S. Trustee reports; (j) preparing required reports to the Government DIP Lenders and the First Lien Lenders; and (k) addressing various other matters necessary to fulfill the duties assigned to the Liquidation Trust under the Plan and the Liquidation Trust Agreement.

---

[5]      Pursuant to the Plan, any recovery by the holders of General Unsecured Claims depended entirely upon the success of the Daimler Litigation.  During the process of soliciting acceptances of the Plan, the Debtors made clear that, "[*u*]*ntil it is clear that such a [potential] recovery [under the Plan] will be available, the Debtors anticipate that the review and allowance of General Unsecured Claims will be delayed.  Such delay could be substantial*." See, e.g., Disclosure Statement at p. S-1 (emphasis in original).  Pursuant to the Plan, the Litigation Manager, not the Liquidation Trustee, managed the Daimler Litigation.  Ultimately, the Daimler Litigation did not succeed in generating any recovery, and thus no distributions on account of General Unsecured Claims were possible.  See, e.g., *Notice of Conclusion of Daimler Litigation and Treatment of the Daimler Fund Balance*, dated July 11, 2013 (Docket No. 8198) (the "Daimler Litigation Conclusion Notice") (copy attached hereto as Exhibit B).

[6]      Notably, certain contested matters and adversary proceedings in the Debtors' chapter 11 cases did not involve the Liquidation Trust because these proceedings were solely between third parties (e.g., between creditors and New Chrysler).

10. As demonstrated by the Final Report, the Liquidation Trust pursued its efforts to complete the winddown of the Debtors' Estates diligently and efficiently, completing these activities as expeditiously as possible and well under budget. In doing so, the Liquidation Trust has achieved significant successes, including by realizing much greater recoveries than expected for its primary beneficiaries.

11. At this time, the Liquidation Trust has substantially completed virtually all of the tasks required under the Plan and the Liquidation Trust Agreement. Specifically, among other things:

- All tangible Liquidation Trust Assets have been sold, and substantially all intangible assets have been monetized, where possible, or abandoned with approval of the Court.

- All Secured, Administrative and Priority Claims entitled to distributions under the Plan have been addressed and distributions to the holders of those claims are complete,[7] except with respect to a Secured Claim asserted by Safeco Insurance Company of America ("Safeco")[8] and certain distributions remaining to be made to the Government DIP Lenders and the First Lien Lenders, as outlined in the Final Report, the DIP Lender Winddown Order and the First Lien Winddown Order.[9]

---

[7] As noted *supra*, General Unsecured Claims were not eligible for distributions because of the outcome of the Daimler Litigation.

[8] Safeco issued various appellate bonds to the Debtors, including a bond to secure the appeal of a judgment in California. To obtain the bond, the Debtors posted cash collateral with Safeco. The Debtors ultimately settled the judgment and appeal, and the settlement was approved by an order of this Court entered on September 24, 2009 (Docket No. 5618) (the "Settlement Order"). Pursuant to the Settlement Order, the plaintiff's attorney filed an Acknowledgement of Full Satisfaction of Judgment and an Exoneration of Bond to permit the excess collateral held by Safeco to be returned to the Debtors. Unfortunately, the Exoneration of Bond was not accepted by the appellate court. Despite years of effort, additional administrative steps have been necessary to complete the exoneration of the relevant bond. Efforts to complete these steps are now in process. Once completed, the excess collateral in the estimated amount of approximately $7.5 million will be returned to the Liquidation Trust, and Safeco's secured claim will be resolved without any further payment from the Liquidation Trust. On February 28, 2014, the Liquidation Trust filed protective objections to Safeco's claims (see Docket Nos. 8288 and 8290), but the Liquidation Trust does not anticipate that the assistance of this Court will be needed to resolve these objections.

[9] As further detailed in the Final Report, the DIP Lender Winddown Order and the First Lien Winddown Order, additional disbursements to the Government DIP Lenders and the First Lien Lenders will include, without limitation, (a) the reimbursement of the Government DIP Lenders for any unused Liquidation Funds (see DIP Lender Winddown Order at ¶ 5); (b) the reimbursement of the First Lien Lenders for any

- Tax filings required to date have been made.

***Remaining Adversary Proceedings and Contested Matters***

12.     In addition, virtually all adversary proceedings and contested matters in

the Debtors' chapter 11 cases are complete.  Indeed, only a few items remain open and pending

in these cases.  With respect to adversary proceedings, only two remain open with ongoing

activity (collectively, the "Pending Adversary Proceedings"):   (a) Garcia v. Chrysler Group

LLC, Adv. Pro. No. 15-01093; and (b) Blackwell v. Chrysler Group LLC, Adv. Pro.

No. 15-01019.  The Pending Adversary Proceedings are actions against the entity now known as

FCA US LLC, f/k/a Chrysler Group LLC ("New Chrysler"), and the Liquidation Trust has no

involvement or interest in these matters and will not be affected by the outcome thereof.

As explained below, the fact that the Pending Adversary Proceedings are open does not bar the

Court from closing the cases.[10]

13.     With respect to contested matters in these cases, the following matters

remain open (collectively, the "Pending Contested Matters"):

- An intercreditor dispute between the First Lien Lenders and
  the Government DIP Lenders initiated by a motion of the First
  Lien Agent (Docket No. 8326) filed on September 19, 2014
  (the "2009 Tax Refund Dispute").  The 2009 Tax Refund Dispute

---

unused Covered Costs (see First Lien Winddown Order at ¶¶ 3-4); (c) the disbursement of the amounts that
the Liquidation Trust has collected and is holding subject to the outcome of a pending tax refund allocation
dispute between the Government DIP Lenders and the First Lien Lenders (as noted further *infra* and
referred to as the 2009 Tax Refund Dispute); and (d) the disbursement to the First Lien Lenders and/or the
Government DIP Lenders, as applicable, of the proceeds, if any, of any additional collections on their
collateral.  See DIP Lender Winddown Order at ¶ 5; First Lien Winddown Order at ¶ 16.

[10]     In addition, there are 15 adversary proceedings related to the Debtors' cases that appear either (a) to have
been fully and finally resolved but are not expressly designated on their dockets as being closed or (b) not
to have been prosecuted for extended periods of time.  The Liquidation Trust requests that the Final Decree
direct the Clerk of the Court to close these adversary proceedings, which are identified on Annex 1 to the
Final Decree.  One additional case also identified on Annex 1 to the Final Decree is James and Felicia
Ricks v. Chrysler Group LLC, et al., Case No. 10-cv-09674 (S.D.N.Y.) (the "Ricks Case").  By an order
and opinion of the District Court dated July 25, 2011 (Docket Nos. 22, 23), the Ricks Case was referred to
this Court; however, the Ricks Case has never appeared on the bankruptcy court docket and has never been
further prosecuted.

arose under the Winddown Orders and the Plan with respect to the First Lien Lenders' and the Government DIP Lenders' respective rights to receive distributions from the Liquidation Trust of certain federal and state tax refunds attributable to the 2009 tax year.  On December 9, 2014, the Liquidation Trust filed a statement (Docket No. 8344) expressly taking no position in this Pending Contested Matter.  The Liquidation Trust understands that the First Lien Agent and the Government DIP Lenders are discussing the potential resolution of this dispute.  This matter currently is set for hearing on July 14, 2015.

- A third party dispute between New Chrysler and certain agencies of the States of Indiana and Illinois concerning the unemployment tax rate that those States are permitted to apply to New Chrysler (the "New Chrysler Unemployment Tax Dispute").[11] The Liquidation Trust is not a party to the New Chrysler Unemployment Tax Dispute and will not be affected by the outcome of the New Chrysler Unemployment Tax Dispute. This matter currently is set for oral argument on July 14, 2015.

- A motion by Jones Day seeking approval of a supplemental fee agreement with the Liquidation Trust (the "Fee Motion").  The Fee Motion is expected to be heard concurrently with the approval of this Motion.

14.    Based on the authorities cited below, just as the Pending Adversary Proceedings may remain open, the Liquidation Trust proposes that the Pending Contested Matters may also continue to be administered by the Court after case closing.  Critically, the Liquidation Trust is not an active party in interest in any of the Pending Contested Matters. While the resolution of the 2009 Tax Refund Dispute may impact the distributions that the Liquidation Trust makes to the parties to that matter, the Liquidation Trust has taken no position on the issues involved and does not expect to play any meaningful part in the litigation of this

---

[11]    New Chrysler initiated the New Chrysler Unemployment Tax Dispute by filing a motion to enforce the Sale Order on October 18, 2013 (Docket No. 8218).  Since then, the New Chrysler Unemployment Tax Dispute was ruled upon by this Court (Docket No. 8058), appealed to the District Court and now is before this Court again on remand.  The parties to the New Chrysler Unemployment Tax Dispute have submitted a full round of briefing for the Court's consideration.  See Docket Nos. 8362, 8366, 8367, 8368, 8372 and 8373.  The Michigan Unemployment Insurance Agency previously was a party to this dispute, but was dismissed by agreement of the parties.  See Docket No. 8395.

matter.  Likewise, the Liquidation Trust supports – and does not plan to object to – the Fee

Motion.  Under the circumstances, there is no need to keep the bankruptcy cases open simply to

resolve the Pending Contested Matters.  Moreover, given the status of the Pending Contested

Matters (all of which are scheduled for hearings before or concurrently with the hearing on this

Motion), it is likely that some or all of these matters will be concluded by the time the Court

enters the Final Decree.

***Remaining Liquidation Trust Activities***

15.    At this point, there is little left for the Liquidation Trust to do, and no

expectation that the Liquidation Trust will need the assistance of this Court to complete its

remaining work.  As noted above, most of the remaining work involves:  (a) the collection of

a few remaining intangible assets (if possible); (b) completing the final distributions to

the Government DIP Lenders and the First Lien Lenders; (c) completing any other necessary or

appropriate disbursements; (d) the preparation and filing of final tax returns; (e) taking the steps

necessary to dissolve and terminate the Liquidation Trust (including filing a notice thereof as

required by Section 12.4 of the Liquidation Trust Agreement); and (f) providing for the

maintenance of books and records by the Liquidation Trustee as required by the Liquidation

Trust Agreement.[12]

---

[12]    Section 12.4 of the Liquidation Trust Agreement provides:

> Except as otherwise provided under the Plan or this Agreement, for a period of five years after the distribution of all of the Liquidation Trust Assets, ***the Liquidation Trustee*** will retain the books, records and files that have been delivered to or created by the Liquidation Trustee, at which time the Liquidation Trustee may dispose of such books, records and files in any manner that the Liquidation Trustee deems appropriate.

(emphasis added).

*Remaining Funding*

16.    The Liquidation Trust has funding to complete these tasks.  Distributions to the First Lien Lenders and the Government DIP Lenders will be made from their respective collateral.  <u>See</u>, <u>e.g.</u>, Plan §§ II.A.1.c.ii, II.B.2.c, II.B.2.h; First Lien Winddown Order ¶ 16; DIP Lender Winddown Order ¶ 5.  Similarly, each lender group has funded activities relating directly to the administration of their collateral.  <u>See</u>, <u>e.g.</u>, Plan §§ II.A.1.c.i, II.B.2.e, IV.F; First Lien Winddown Order ¶¶ 3-4; DIP Lender Winddown Order ¶¶ 2, 3; Winddown Budget Order (as defined below).  The Government DIP Lenders also provided funding for payment of claims and various activities relating to the winddown of the Estates, much of which is anticipated to remain unused and be returned to the U.S. Treasury on behalf of the Government DIP Lenders. <u>See</u> Final Report at 2-3.  Further, the Liquidation Trust has approximately $3.8 million in unencumbered funds that remain unused following the conclusion of the Daimler Litigation (the "<u>Remaining Unencumbered Funds</u>").  <u>See</u> Daimler Litigation Conclusion Notice at ¶¶ 14-22. As described in detail in the Daimler Litigation Conclusion Notice, these funds are free and clear of all liens, including the liens of the Government DIP Lenders, and are available for use in the discretion of the Liquidation Trustee.  <u>See</u>, <u>e.g.</u>, Daimler Litigation Conclusion Notice at ¶¶ 19-20 (citing DIP Lender Winddown Order at ¶ 9(a); Plan at §§ IV.A.1, IV.G.2.b.ix; and Liquidation Trust Agreement, at § 4.3.3); <u>see also</u> DIP Lender Winddown Order at ¶ 10.

17.    Among other things, the Remaining Unencumbered Funds may be used for the following purposes in the discretion of the Liquidation Trustee:  (a) renew, extend or otherwise purchase necessary insurance for the Liquidation Trust; (b) pay fees owing to the United States Trustee pursuant to 28 U.S.C. § 1930, which the Liquidation Trust expects will be paid at or promptly after case closing; (c) fund costs associated with the preparation of

necessary tax returns and related tax advice; (d) provide additional funding for the Liquidation

Trust's core professionals (e.g., as requested in the Fee Motion or for any post-case closing

activities) and any additional professionals or other consultants that the Liquidation Trustee

determines are necessary or appropriate in connection with work to winddown the bankruptcy

estates and the Liquidation Trust;[13] (e) fund the compensation and expenses of the Liquidation

Trustee, consistent with the terms of the Liquidation Trust Agreement; and (f) address other

contingencies.  See, e.g., Daimler Litigation Conclusion Notice at ¶ 21.  Any unused portion of

these funds ultimately will be donated to one or more Charitable Organizations, as provided in

the Plan.  See Plan § II.A.1.c.iv.

### *Authority for Remaining Activities*

18.     The Plan, the Confirmation Order and the Liquidation Trust Agreement all

make clear that the Liquidation Trust may complete the remaining administrative tasks without

court approval.  See, e.g., Liquidation Trust Agreement at § 5.10.1 (providing that

"the Liquidation Trustee will not be required to obtain the approval of the Bankruptcy Court . . .

or account to the Bankruptcy Court . . . for, the exercise of any right, power or privilege

conferred hereunder" except "as otherwise provided in the Plan or [the Liquidation Trust]

---

[13]     In accordance with the *Agreed Order Pursuant to Sections IV.B.3.b and X.A.224 of the Second Amended Joint Plan of Liquidation and the Liquidation Trust Agreement (A) Modifying the Winddown Budget and Authorizing Further Use of Cash Collateral by RJM I, LLC as Liquidation Trustee on Behalf of Old Carco Liquidation Trust and (B) Granting Related Relief* (Docket No. 7974) (the "Winddown Budget Order"), entered by the Court on August 25, 2011, the Liquidation Trust entered into fixed fee arrangements with certain of its core professionals (e.g., Jones Day and Capstone Advisory Group, LLC) in connection with the liquidation of the DIP Collateral.  A final payment of 30% of the fixed fee for each professional is payable from designated Winddown Funds (not the Remaining Unencumbered Funds) when the Liquidation Trust files its Final Report.  Because the Remaining Unencumbered Funds are not DIP Collateral under the Winddown Orders and the Plan, these funds are not subject to the Winddown Budget Order and may be used, in the discretion of the Liquidation Trustee, to supplement the fixed fee arrangements entered into by the Liquidation Trust and its professionals in connection therewith. See Daimler Litigation Conclusion Notice at § 21.  The Liquidation Trustee has agreed to use certain of these funds to pay supplemental amounts to Jones Day, subject to approval of the Fee Motion.

Agreement").[14]  Thus, the remaining tasks can be accomplished without these cases remaining

open.  Moreover, because the Liquidation Trust would retain the right under the proposed Final

Decree — consistent with section 350(b) of the Bankruptcy Code — to seek to reopen any of

the Debtors' cases if needed, closing the Old Carco and Alpha cases will not bar access to this

Court if required.

## <u>Argument</u>

19.      After an estate is "fully administered" and, typically, contemporaneously

with discharging the trustee,[15] the court "shall close the case" by entering a final decree.

<u>See</u> 11 U.S.C. § 350(a); Fed. R. Bankr. P. 3022; Local Rule 3022-1.

20.      The term "fully administered" is not defined in the Bankruptcy Code or

the Bankruptcy Rules.  Courts generally consider the following factors in deciding whether to

close a chapter 11 case:  (a) whether the order confirming the plan has become final; (b) whether

deposits required by the plan have been distributed; (c) whether the property proposed by

the plan to be transferred has been transferred; (d) whether the debtor or the successor of

the debtor under the plan has assumed the business or the management of the property dealt with

by the plan; (e) whether payments under the plan have commenced; and (f) whether all motions,

---

[14]      Nevertheless, the Liquidation Trustee has reserved the right to seek Court relief where he determines in his reasonable discretion that such relief is necessary, appropriate or desirable.  <u>See</u> Liquidation Trust Agreement at § 5.10.2.  As an example, the Liquidation Trustee has determined that it is appropriate and desirable, out of an abundance of caution, to seek approval of the fee arrangements with Jones Day, as reflected in the Fee Motion.

[15]      Here, because the Liquidation Trust will remain in existence after the cases are closed to conduct limited additional activities, and the Liquidation Trustee has additional obligations even after the Liquidation Trust is terminated (<u>e.g.</u>, to maintain books, records and files under Section 12.4 of the Liquidation Trust Agreement), the proposed Final Decree will not discharge the Liquidation Trustee as would a final decree in a chapter 7 or chapter 13 case.  Nevertheless, the Liquidation Trust requests that, upon the termination of the Liquidation Trust and with no further order of the Court, the Liquidation Trust and the Liquidation Trustee be discharged and relieved of all further duties or obligations in connection with the Chapter 11 Cases, the Plan, the Confirmation Order, the Liquidation Trust Agreement, the Winddown Orders or any other Plan Exhibit or related document except as expressly provided to the contrary in Section 12.4 of the Liquidation Trust Agreement.

contested matters and adversary proceedings have been finally resolved.  See Bankruptcy

Rule 3022 Advisory Committee Note (1991); In re IDC Servs., Inc., 1998 WL 547085

(S.D.N.Y. 1998), at *3.  The six factors, however, are merely guidelines.  Each of the factors

need not be present before a court enters a final decree.  See In re Mold Makers, Inc.,

124 B.R. 766, 768 (Bankr. N.D. Ill. 1990).

21.     Several courts have applied a lesser benchmark, evaluating only if the case

has reached the point of "substantial consummation" as defined in section 1101(2) of

the Bankruptcy Code.  See, e.g., IDC Servs., at *3 (citing In re Walnut Assocs. v. Saidel,

164 B.R. 487, 492 (E.D. Pa. 1994); In re BankEast Corp., 132 B.R. 665, 668 n.3 (Bankr. D.N.H.

1991)).  Substantial consummation, as defined in section 1101(2) of the Bankruptcy Code, means

(a) the transfer of all or substantially all of the property proposed by the plan to be transferred;

(b) the assumption by the debtor or by the successor to the debtor under the plan of the business

or of the management of all or substantially all of the property dealt with by the plan; and

(c) the commencement of distributions under the plan.  11 U.S.C. § 1101(2).

22.     Here, the entry of a final decree is appropriate under either standard.

The Liquidation Trust has accomplished the "substantial consummation" of the Debtors' cases,

and the chapter 11 cases are "fully administered."  More specifically, as summarized above and

detailed further in the Final Report:

a.     The Confirmation Order has become final.

b.     All property proposed by the Plan to be transferred has been transferred.

c.     The Liquidation Trust, as the successor in interest of the Debtors under
       the Plan, has assumed the management of the property dealt with by
       the Plan and has substantially completed the sale, monetization or
       collection of that property.

d.     Payments under the Plan have commenced and are nearly completed.

     e.     All motions, contested matters and adversary proceedings have been finally resolved, except to the limited extent discussed above.

As such, the Liquidation Trust has virtually completed the administration and implementation of the Plan.

     23.     Notably, although the Pending Adversary Proceedings and the Pending Contested Matters are not concluded, the Court nevertheless may close the chapter 11 cases while retaining jurisdiction to oversee the resolution of the Pending Adversary Proceedings and the Pending Contested Matters.  See In re CCT Commc'ns, Inc., 420 B.R. 160, 176-77 (Bankr. S.D.N.Y. 2009) (dismissing a small business debtor's bankruptcy case, but retaining jurisdiction over an adversary proceeding and fee applications based on factors of judicial economy, convenience of the parties, fairness and comity); In re JMP-Newcor Int'l, Inc., 225 B.R. 462, 465 (N.D. Ill. 1998) (finding that the bankruptcy case had been fully administered, and entering a final decree closing the case, although an adversary proceeding remained open and apparently active and certain disbursements remained to be made under the plan); In re Junior Food Mart of Arkansas, Inc., 201 B.R. 522, 525 (Bankr. E.D. Ark. 1996) ("The Court has the authority to close or dismiss a case although an adversary proceeding may remain pending. . . .  [D]ismissal of the case does not mandate dismissal of adversary proceedings. . . .  The bankruptcy court has the power to retain jurisdiction over an adversary proceeding despite dismissal of the case."); Diversified Mortgage Investors, Inc. v. Lake Tahoe Land Co. (In re Lake Tahoe Land Co.), 12 B.R. 479, 480 (Bankr. D. Nev. 1981) (denying a motion to dismiss an adversary proceeding where the argument to dismiss was based on the main bankruptcy case having been dismissed).

     24.     Significantly, conditioning the closing of these chapter 11 cases on the Pending Adversary Proceedings and the Pending Contested Matters being fully and finally resolved would make the timing subject to the influence of third parties who often are

-14-

the primary (or the sole) litigants in those actions.  The Liquidation Trust has no control over

those parties' choices to prolong those proceedings or even to initiate new ones.  The Liquidation

Trust respectfully submits that the closing of the chapter 11 cases should not be subject to such

uncertainties and activities beyond its control.  Given the status of these cases as described above

and in the Final Report, and having passed the fifth anniversary of the Effective Date,

the Liquidation Trust submits that now is the appropriate time to enter the Final Decree.  In

addition, a Final Decree in these cases will save certain costs that would be incurred if the case

unnecessarily remained open, such as the costs of the claims agent, U.S. Trustee fees and other

reporting costs.  This inures to the direct benefit of the Liquidation Trust's beneficiaries.

25.     Further, although certain limited tasks remain to be completed, these cases

do not need to remain open for the Liquidation Trust to complete those tasks.  The Liquidation

Trust already is empowered to complete these tasks without further Court supervision.  Thus, it

is appropriate for this Court to enter the Final Decree closing the Old Carco and Alpha cases,

while expressly (a) reserving the Liquidation Trust's right to reopen any one or more of

the Debtors' cases for cause, pursuant to section 350(b) of the Bankruptcy Code; and

(b) retaining jurisdiction over the Pending Adversary Proceedings and the Pending Contested

Matters (to the extent that they remain pending at the time the Final Decree is entered).

26.     In accordance with the requirements of Local Rule 3022-1, a closing

report for Old Carco and Alpha is attached hereto as <u>Exhibit C</u>.

**<u>Request to Terminate the Appointment of Epiq as Claims and Noticing Agent</u>**

27.     Epiq has served as the claims and noticing agent in these cases since

the Petition Date, pursuant to an order of appointment entered on May 4, 2009 (Docket No. 253)

(the "<u>Epiq Appointment Order</u>").

28.     The Epiq Appointment Order provided, among other things, that "[u]pon the completion of Epiq's duties and responsibilities and at the closing of these chapter 11 cases, Epiq shall take the appropriate action to obtain an order from this Court terminating its duties and responsibilities in these cases, in accordance with the [services agreement between Epiq and the Debtors] and this Order."  Epiq Appointment Order at ¶ 4.

29.     With the status of these cases being essentially completed as discussed above, Epiq has no remaining duties and responsibilities in these cases except (a) to serve the Final Decree and (b) to "box and transport all original documents in proper format, as provided by the Clerk's Office, to the Federal Archives," as contemplated in the motion requesting the appointment of Epiq (Docket No. 30 at ¶ 18(s)) and this Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*.  Accordingly, the Liquidation Trust requests that the Court provide in the Final Decree for the termination of Epiq's appointment as claims and noticing agent in these cases, effective upon, and subject to, Epiq's completion of the foregoing limited tasks.

## Request for Release of Liquidation Trust Parties

30.     Section 8.3 of the Liquidation Trust Agreement contains a limitation of liability provision in favor of the Debtors, the Liquidation Trustee, the Liquidation Trust and their respective directors, managers, officers, employees, agents, professionals and other representatives (collectively, the "Liquidation Trust Parties") for, among other things, their acts or omissions in implementing the terms of the Plan, the Winddown Orders, the Liquidation Trust Agreement and related documents (the "Limitation of Liability Provision").  However, by its terms, the Limitation of Liability Provision does not protect the Liquidation Trust Parties with respect to any act or omission to the extent that such act or omission is determined in a Final

Order to have constituted willful misconduct or gross negligence. See Liquidation Trust

Agreement, § 8.3.[16]

31.     Given the substantial and good faith efforts expended by the Liquidation

Trust Parties over the extended period since the Effective Date in reliance on the Limitation of

Liability Provision, the Liquidation Trust believes that it is appropriate for the Court to confirm

in the Final Decree that the Liquidation Trust Parties are released and exculpated from all

liability on account of any acts or omissions in connection with (a) the Chapter 11 Cases;

(b) the winddown of the Estates and administration of the Liquidation Trust Assets; and

(c) the implementation of the Plan, the Confirmation Order, the Liquidation Trust Agreement,

the Winddown Orders, the other Plan Exhibits and any other orders of this or other courts,

*provided* in each case that such acts or omissions are not determined by a Final Order to have

constituted willful misconduct or gross negligence (the "Liquidation Trust Party Release"). For

---

[16]     In particular, the Limitation of Liability Provision states, in relevant part, as follows:

> Limitation of Liability. *** The Liquidation Trustee will not be liable with respect to any action it takes or omits to take in good faith with the approval or consent, or at the direction, of the First Lien Agent, the Government DIP Lenders, the U.S. Trustee or the Litigation Manager to the extent this Agreement expressly contemplates such party's approval, consent or direction. The Liquidation Trustee will not be liable for punitive, exemplary, consequential or special damages for a breach of this Agreement under any circumstances or for any act or omission not constituting willful misconduct or gross negligence. The Debtors, the Liquidation Trust, the Liquidation Trustee and their respective directors, managers, officers, employees, agents, professionals and other representatives, acting in such capacity, will have no liability to any Person or Entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, performance, confirmation or consummation of the Plan, the Disclosure Statement, the Winddown Orders, this Agreement or any contract, instrument, release or other agreement or document entered into, or any other act taken or omitted to be taken, in connection with the Plan, the Winddown Orders or this Agreement; *provided, however,* that the foregoing provisions of this paragraph will have no effect on the liability of any Person or Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted willful misconduct or gross negligence.

Liquidation Trust Agreement § 8.3.

the avoidance of doubt, the Liquidation Trust Party Release is in addition to, and does not modify, limit or otherwise affect, the Limitation of Liability Provision or any other protections afforded to the Liquidation Trust Parties in or by the Liquidation Trust Agreement, the Plan or any other document, statute, rule or common law.[17]

32.     Similar relief has been granted by this Court and courts in other districts in connection with entry of a final decree closing a chapter 11 case.  See, e.g., In re EUSA Liquidation Inc., Case No. 09-15008 (SMB) (June 14, 2013) (final decree closing a chapter 11 case and also stating that "the Liquidating Trustee and its retained professionals are hereby… released from any liability on account of any acts or omissions in connection with this Chapter 11 case and the affairs of the Trust, except with respect to acts constituting fraud, willful misconduct or gross negligence."); In re Electric Scooter Wind Down Corp., Case No. 09-13347 (KG) (Bankr. D. Del. Feb. 8, 2012) (final decree closing the case and providing that, in addition to the releases, exculpations and injunctions in the plan and related documents, the Liquidation Trust and the Liquidation Trustee and their respective affiliates, employees, officers, directors, attorneys and representatives shall have no liability in connection with the work performed to carry out the plan, the liquidation trust agreement and the confirmation order).[18]

**Notice**

33.     The Liquidation Trust will provide notice of this Motion in accordance with the provisions of General Order M-182 and, to the extent not otherwise provided thereby,

---

[17]     Solely by way of example, and not limitation:  (a) the Liquidation Trust Parties are protected by the exculpation provisions in Section III.E.6 of the Plan, the applicable releases in Section III.E.5 of the Plan, the injunctions in Section III.E.4 of the Plan and paragraphs 25 through 32 of the Confirmation Order; and (b) the Indemnified Liquidation Trust Parties (as defined in the Liquidation Trust Agreement) are entitled to indemnification from the Liquidation Trust under Section 8.4 of the Liquidation Trust Agreement.

[18]     Such relief is particularly appropriate here because the Indemnified Liquidation Trust Parties will no longer be able to look to the Liquidation Trust for indemnification after the Liquidation Trust's affairs are concluded and its remaining assets disbursed.

(a) by electronic mail on the parties on the General Service List in these cases and (b) by electronic mail and overnight delivery on the parties identified in paragraph 70 of the Confirmation Order.  The Liquidation Trust respectfully submits that no further notice of the Motion is necessary.

## No Prior Request

34.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Liquidation Trust respectfully requests that the Court enter the Final Decree, substantially in the form attached hereto as Exhibit D:  (a) granting the relief sought herein; and (b) granting such other and further relief to the Liquidation Trust as the Court may deem just and proper.

Dated: June 18, 2015
        New York, New York

Respectfully submitted,

  s/  Corinne Ball
Corinne Ball
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR
OLD CARCO LIQUIDATION TRUST

# EXHIBIT A

**Final Report**

OLD CARCO LIQUIDATION TRUST

FINAL REPORT

Old Carco Liquidation Trust (the "Liquidation Trust") is the successor in interest to the debtors in the chapter 11 cases captioned *In re Old Carco LLC f/k/a Chrysler LLC*, which have been jointly administered under Case No. 09-50002 (the "Bankruptcy Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").   The Liquidation Trust was established on April 30, 2010 (the "Effective Date"), upon the effectiveness of the *Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified*, which was (a) confirmed by and attached to the *Order Confirming the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified* (Docket No. 6875) (the "Confirmation Order"); and (b) further modified by the *Order, Pursuant to Section 1127(b) of the Bankruptcy Code, Approving Technical Modification of Confirmed Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified*, dated April 28, 2010 (Docket No. 6923) (the confirmed plan of liquidation, as modified and including all exhibits thereto, the "Plan").   Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

The Liquidation Trust was established for the following purposes, among others:  (a) collecting, receiving, holding, maintaining, administering and liquidating the Liquidation Trust Assets; (b) making distributions to holders of Allowed Claims in accordance with the terms of the Plan; (c) resolving Disputed Claims; (d) pursuing or resolving Recovery Actions and other Causes of Action or litigation; (e) closing the Bankruptcy Cases; and (f) otherwise implementing the Plan and finally administering the Estates; all pursuant to and in accordance with the Plan and the Liquidation Trust Agreement.  Generally, with limited exceptions, the assets held by the Liquidation Trust are comprised of collateral of either the First Lien Lenders or the Government DIP Lenders.  As such, consistent with the Plan and the Winddown Orders, the activities of the Liquidation Trust have been funded primarily by (a) the First Lien Lenders in connection with the administration of First Lien Collateral and (b) the Government DIP Lenders with respect to the administration of DIP Collateral and most other case activities.

Under the guidance of the Liquidation Trustee and the efforts of its professionals, the Liquidation Trust has expedited the process of implementing the Plan and winding down the Liquidation Trust Assets. The Liquidation Trust has now disposed of all real property assets; monetized numerous other valuable assets; collected virtually all known tax refunds and other intangible assets totaling tens of millions of dollars; resolved all major disputes; abandoned burdensome assets; resolved virtually all secured, administrative and priority claims; defended numerous bankruptcy court orders on appeal to the United States District Court for the Southern District of New York (the "District Court") and the United States Court of Appeals for the Second Circuit (the "Second Circuit"); filed all required tax returns; filed or

submitted all required reports; and addressed numerous other administrative matters necessary to comply with the Plan, the Bankruptcy Code and the other obligations of the Liquidation Trust.

The original court-approved winddown budget for use of funds provided by the Government DIP Lenders assumed that the sale proceeds for DIP Collateral would be $45.1 million and cash disbursements using funds from the Government DIP Lenders would be $259.3 million for a net cash usage of $214.2 million. Based on the current status of the Bankruptcy Case, the Liquidation Trust estimates that the total cash receipts from DIP Collateral will be approximately $83.2 million, while cash disbursements using funds provided by the Government DIP Lenders will total only $145.4 million.  This represents an overall improvement of $152.0 million, thereby dramatically reducing the net cash usage from $214.2 million to $62.2 million.

The cash recoveries to the First Lien Lenders to date have been $507.7 million.  This amount likewise is well ahead of the initial projections of recoveries.

As noted above, the following table illustrates, as of the date of this Report, the value returned to the DIP and First Lien Lenders.

**Lender - Results**
*($ in millions)*

|  | Original Budget | Actual Results | Value Returned |
|---|---|---|---|
| **DIP Lenders** |  |  |  |
| DIP Budget | 259.3 | 145.4 | 113.9 |
| DIP Receipts | 45.1 | 83.2 | 38.1 |
|  |  |  |  |
| **Bank Lenders** |  |  |  |
| Bank Receipts | 395.5 | 507.7 | 112.2 |

In addition, an estimated $24.0 million of tax refunds will be allocated between the Government DIP Lenders and the First Lien Lenders upon settlement of a pending motion filed by the First Lien Agent. See Docket No. 8326.

The Daimler Litigation was the only asset of the Liquidation Trust available to fund potential recoveries to general unsecured creditors in Class 3A under the Plan.  This litigation was pursued under the supervision of the Litigation Manager on behalf of the Liquidation Trust, and the Liquidation Trustee had no role in this litigation.  Efforts to pursue the Daimler Litigation were funded by the Daimler Fund established pursuant to the Winddown Orders.  Ultimately, the Daimler Litigation was dismissed by the Bankruptcy Court in May 2011, and the dismissal was upheld on appeal to the District Court and the Second Circuit.  As a result,

no Daimler Proceeds were recovered by the Liquidation Trust, and no distributions have been or will be made to general unsecured creditors.

Because the Daimler Litigation was dismissed without discovery, most of the Daimler Fund was unused. Consistent with the terms of the Plan and the Liquidation Trust Agreement, after returning a portion of the remaining Daimler Fund to the First Lien Lenders, the remaining General Unsecured Daimler Fund Balance has been retained by the Liquidation Trust. Pursuant to the Plan, on July 11, 2013, the Liquidation Trust used the General Unsecured Daimler Fund Balance to fund the Additional Proceeds Account, and the Daimler Fund was closed. The funds in the Additional Proceeds Account are free and clear of all liens and claims, including any liens and claims of the Government DIP Lenders. See, e.g., DIP Lender Winddown Order, at ¶ 9(a); Plan, at § IV.A.1. In accordance with Section IV.G.2.b.ix of the Plan and Section 4.3.3 of the Liquidation Trust Agreement, the Liquidation Trustee has determined to utilize the funds deposited in the Additional Proceeds Account to cover various identified and projected potential deficiencies in the Trust Accounts, as necessary. These matters were disclosed and described in greater detail in the *Notice of Conclusion of Daimler Litigation and Treatment of Daimler Fund Balance*, filed on July 11, 2013 (Docket No. 8198) (the "Notice of Conclusion of Daimler Litigation").

The detailed report that follows provides specific details of the Liquidation Trust's sources and uses of funds, initial tasks at inception of the winddown, key tasks completed and some of the major successes achieved.

## **Winddown Funding**

### Initial Funding at Inception of Winddown

– The Liquidation Trust was provided with $259.3 million in its budget from the Government DIP Lenders to fund all winddown activities, including selling assets, settling claims and implementing the Plan, *plus* an additional $41.6 million was provided to cover pre-winddown costs incurred during the initial phase of the Chapter 11 Cases. These amounts were provided in discrete escrow accounts – referred to as Trust Accounts under the Plan – for specified purposes consistent with the terms of the DIP Lender Winddown Order and the Plan. In accordance with the *Agreed Order Pursuant to Sections IV.B.3.b and X.A.224 of the Second Amended Joint Plan of Liquidation and the Liquidation Trust Agreement (A) Modifying the Winddown Budget and Authorizing Further Use of Cash Collateral by RJM I, LLC as Liquidation Trustee on Behalf of Old Carco Liquidation Trust and (B) Granting Related Relief* (Docket No. 7974) (the "Winddown Budget Order"), entered by the Bankruptcy Court on August 25, 2011, the Winddown Budget was modified with the approval of the U.S. Treasury to address certain funding needs of the Liquidation Trust.

Results

    – As the following table illustrates, as of the date of this Report, the Estate has used only $151.0 million of the approved cash disbursement budgets provided by the Government DIP Lenders, resulting in a savings of $114.4 million, and a 44.1% favorable variance to budget.

[CHART ON NEXT PAGE]

**DIP Lender Budgets**

*($ in millions)*

| | Original Budget | Estimated Actual | Savings |
|---|---|---|---|
| Tax Trust Accounts: | | | |
| Priority Claims Account | 21.00 | 21.01 | (0.01) |
| Segregated Tax Account | 50.00 | 10.00 | 40.00 |
| Sales & Use Escrow | 63.00 | 11.68 | 51.32 |
| Property Tax Account | 14.00 | 3.50 | 10.50 |
| Sub-Total Tax Budget | 148.00 | 46.19 | 101.81 |
| Additional Fee Escrow | 10.00 | 15.90 | (5.90) |
| Additional Dealer Escrow | 4.00 | 4.00 | - |
| Winddown Fee Trust Account | 27.50 | 26.43 | 1.07 |
| Sub-Total Other Winddown Budget | 41.50 | 46.33 | (4.83) |
| Additional Winddown Costs Escrow: | | | |
| Professional Fees May - August | 29.80 | 23.00 | 6.80 |
| Creditors Committee Fees and Expenses | 1.00 | 1.00 | - |
| Claims Administrator | 4.50 | 4.50 | - |
| U.S. Treasury & EDC Professionals | 0.25 | 0.22 | 0.03 |
| Salaries and Benefits  Officers & Board | 0.80 | 0.80 | - |
| U.S. Trustee Fees | 0.50 | 0.50 | - |
| Costs of Preserving & Liquidating Collateral | 1.50 | 0.69 | 0.81 |
| Derivative Losses / Lien Releases | 1.44 | 1.44 | - |
| Other Admin & Post-Effective Date Expenses | 15.00 | 8.73 | 6.27 |
| Sub-Total Additional Winddown Budget | 54.79 | 40.89 | 13.91 |
| Environmental Reserve | 15.00 | 12.00 | 3.00 |
| Total Winddown Budgets | 259.29 | 145.41 | 113.89 |
| | | | |
| Savings transferred to August 25th Budget | (6.14) | | (6.14) |
| | | | |
| August 25th Escrow | | | |
| Winddown Fee Trust Account | 1.00 | 1.00 | - |
| Additional Winddown Fee Funds | 3.20 | 3.20 | - |
| Winddown Expense Funds | 0.13 | 0.08 | 0.05 |
| EDC Expenses | 0.15 | - | 0.15 |
| Unpaid Admin/Priority/Secured Claims | 0.15 | - | 0.15 |
| Fiduciary Bonds | 0.48 | 0.48 | - |
| Annual State Filing Fees | 0.03 | 0.03 | |
| Claims Agent | 0.48 | 0.44 | 0.04 |
| US Trustee Fees | 0.23 | 0.22 | 0.01 |
| Dissolution, Filing and Related Fees | 0.05 | 0.00 | 0.05 |
| Insurance | 0.15 | 0.15 | - |
| Tax Return Preparation Fees | 0.10 | 0.07 | 0.03 |
| Total August 25th Escrow | 6.14 | 5.67 | 0.48 |
| | | | |
| **Totals** | **265.4** | **151.1** | **114.4** |

–

First Lien Reserve

Pursuant to the First Lien Winddown Order, the First Lien Reserve of $15 million was established from the existing proceeds of First Lien Collateral. The First Lien Reserve has been used to pay the Covered Costs with respect to First Lien Trust Assets or First Lien Excluded Assets, consistent with the Plan and the First Lien Winddown Order, and subject to the Minimum Amount of $3 million established by the First Lien Winddown Order. Periodically, the Covered Period has been extended and the First Lien Reserve has been replenished with additional proceeds of the First Lien Collateral. Currently, the Covered Period runs through June 30, 2015, and the balance of the First Lien Reserve is $1.8 million. As of the date of this Report, the First Lien Lenders have provided $42.7 million to replenish the First Lien Reserve.

Additional Proceeds Account

As noted above, the Additional Proceeds Account was funded with unencumbered cash from the General Unsecured Daimler Fund Reserve. Among other things, these funds have been or may be used for some or all of the following purposes: (a) renew, extend or otherwise purchase necessary insurance for the Liquidation Trust; (b) pay fees owing to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (c) pay fees and reimburse expenses incurred by the claims and noticing agent appointed in the Chapter 11 Cases; (d) fund costs associated with the preparation of necessary tax returns and related tax advice; (e) provide additional funding for the Liquidation Trust's core professionals and any additional professionals or other consultants that the Liquidation Trustee determines are necessary or appropriate;[1] (f) fund the compensation expenses of the Liquidation Trustee, consistent with the terms of the Liquidation Trust Agreement; and (g) establish a reserve for contingencies. See Notice of Conclusion of Daimler Litigation.

Currently, the Liquidation Trust is holding $3.8 million in the Additional Proceeds Account.

---

[1]    Pursuant to the Winddown Budget Order, the Liquidation Trust entered into fixed fee arrangements with certain of its core professionals (e.g., Jones Day; Capstone Advisory Group, LLC) in connection with the liquidation of the DIP Collateral. Because the funds deposited in the Additional Proceeds Account are not DIP Collateral under the Winddown Orders and the Plan, these funds are not subject to the Winddown Budget Order and may be used, in the discretion of the Liquidation Trustee, to supplement the fixed fee arrangements entered into by the Liquidation Trust and its professionals in connection therewith. Contemporaneously with the filing of this Final Report, Jones Day has filed its *Motion of Jones Day for an Order Approving Second Supplemental Fee Agreement Between Jones Day and Old Carco Liquidation Trust*, seeking approval of the terms of an agreement with the Liquidation Trustee pursuant to which Jones Day would receive $750,000 over and above its fixed fee arrangement.

# MAJOR CASE ACTIVITIES

## A. Real Property Sales

Initial Tasks at Inception of Winddown

– There were 17 properties that were transferred to the Liquidation Trust subject to the liens of either the Government DIP Lenders or the First Lien Lenders.  These properties (comprised of real property and, in some cases, related buildings and equipment) were:

- Former Indy Foundry (Indianapolis, IN) — DIP Collateral

- Blue Lake South (Indianapolis, IN) — DIP Collateral

- Oakland Technology Park (Auburn Hills, MI) — DIP Collateral

- Warman Lot (Indianapolis, IN) — DIP Collateral

- New Venture Gear (Syracuse, NY) — DIP Collateral

- Toledo Jeep Parkway (Toledo, OH) — DIP Collateral

- Mound Road Parking Lot (Detroit, MI) — DIP Collateral

- Huntsville (Huntsville, AL) — DIP Collateral

- Ballinger (Ballinger, TX) — DIP Collateral

- St. Louis North Assembly (Fenton, MO) — First Lien Collateral

- St. Louis South Assembly (Fenton, MO — First Lien Collateral

- Detroit Axle (Detroit, MI) — First Lien Collateral

- Plymouth Road Operating Plant (Detroit, MI) — First Lien Collateral

- Kenosha Engine (Kenosha, WI) — First Lien Collateral

- Newark Assembly (Newark, DE) — First Lien Collateral

- Sterling Heights Assembly (Sterling Heights, MI) — First Lien Collateral

- Twinsburg Stamping (Twinsburg, OH) — First Lien Collateral

- Challenges to the sale of these properties included significant environmental concerns at certain sites, designated wetlands, potential Brownfield funding, other governmental concerns, age of the facilities, the historic depressed commercial real estate market, the historic depressed automotive industry and related manufacturing overcapacity and the flood of automotive facilities going to market during this period.

Results

- The Liquidation Trust, through the efforts of the Liquidation Trustee and the Liquidation Trust's professionals, worked with potential buyers and various governmental agencies to achieve a closing with the best suited entity. The Liquidation Trust worked with, for example, the Indiana Economic Development Corporation; Michigan Economic Development Corporation; the St. Louis Economic Development Group; the City of Kenosha Wisconsin; the Texas Commission on Environmental Quality; the Alabama Department of Environmental Management; and various other federal, state and local representatives. Additionally, the Liquidation Trust hired four brokers and negotiated with dozens of prospective buyers on the sale of the properties.

- In many cases, this process resulted in negotiations that stretched over a 6- to 12-month process, or longer, and several iterations of deal structures. In the case of the Ballinger, Texas property (DIP Collateral), it took over three years of active marketing and negotiation to dispose of a property with significant environmental liabilities in a non-salable market. The Ballinger transaction employed a unique structure, developed in coordination with governmental authorities, that provided incentives and funding for the remediation of the property.

- Three of the First Lien Collateral properties had protracted marketing periods: (a) the St. Louis Assembly North and South properties, where the economic downturn necessitated a nearly six-year marketing campaign (initiated by the Debtors even before the Liquidation Trust was established), a demolition and an extended redevelopment period; and (b) the Kenosha Engine facility, where the Liquidation Trust needed to resolve complex environmental disputes (described below) that required several years, the involvement of the Bankruptcy Court and, ultimately, a cooperative effort among the First Lien Lenders, the City of Kenosha, the State of Wisconsin and the U.S. government.

- The Liquidation Trust's overriding goal with respect to all transactions was to maximize recoveries to the Government DIP Lenders and the First Lien Lenders, as applicable, while ensuring to the fullest extent possible that each purchaser was an environmentally responsible party that would work cooperatively with the relevant governmental agencies.

- By November 5, 2014, the Liquidation Trust had successfully sold all First Lien Collateral properties for a net recovery of $176.3 million.  Notable sales were:

  - The Sterling Heights Assembly plant that was sold to New Chrysler to ensure its continued adherence to the CAFE Standards.  This sale brought net proceeds of $19.7 million to the First Lien Lenders.

  - The St. Louis North and South Assembly Plants were the sites that took the longest amount of time to market and sell, but the Liquidation Trust ultimately recovered $37.7 million for the First Lien Lenders through the sale of equipment ($463,300), the demolition of the buildings at these sites ($21.3 million) and the sale of the remaining land to a responsible redeveloper for future community growth ($16.0 million).

  - The Twinsburg Stamping plant was sold in an auction for a net recovery of $44.7 million after broker indications put the estimate at $23.5 million.

  - The Newark Assembly plant was sold in a private sale to the University of Delaware to expand their campus (which bordered the plant) for a net result of $23.5 million.

  - The Detroit Axle Plant disposition netted $29.0 million to the First Lien Lenders through the auction of the equipment ($25.3 million) and the sale of the buildings and land ($3.7 million).

  - The Kenosha Engine Plant was abandoned to the City of Kenosha, Wisconsin in 2013.  Prior to the abandonment, the city allowed the Trust to remove and monetize all equipment and above-grade structures.  The results of these activities, conducted under the watchful eye of the City of Kenosha and the applicable federal and state environmental authorities, were equipment proceeds of $16.7 million, scrap proceeds of $1.1 million and the proceeds from the sale of the buildings of $2.7 million.

- The Liquidation Trust successfully disposed of all nine of the properties constituting collateral of the Government DIP Lenders for $3.9 million in proceeds (net of $1.6 million in funding contributed by the Liquidation Trust to effect the Ballinger transaction):

  - The Oakland Technology Park was sold for $2.4 million.

  - The New Venture Gear Property was sold for $1.4 million.

  - The Huntsville Property was sold for $ 0.5 million.

- The Ballinger, Texas Property was transferred as described above to a party responsible for the environmental cleanup of the property.

- Throughout the process, the Liquidation Trust continued to work with the local facility custodians and utilities to bring facility carry costs below their forecast level. This effort has resulted in savings of $500,000.

- The Liquidation Trustee had numerous meetings and discussions with local, County and State Government leaders for each of the properties to ensure their ongoing cooperation throughout the disposition process.

- The Liquidation Trust also maintained regular communication with U.S. Treasury and Office of Recovery for Auto Communities and Workers officials to review the sales process and understand and address local community issues as they arose.

## B. __Vehicle Sales__

Initial Tasks at Inception of Winddown

- In addition to the real property sales, the Liquidation Trust was tasked with tracking and disposing of an estimated 7,597 company lease and fleet vehicles. Because neither the Debtors nor New Chrysler had a process in place to monitor this subset of their fleet inventory, the Liquidation Trust, through its advisors, developed a tracking system, directed the auction process and timing, and reconciled all proceeds.

Results

– As the chart below shows, the Liquidation Trust successfully disposed of all but 27 of the lease and fleet vehicles. The unrecovered vehicles were assumed abandoned by former employees in areas that were unrecoverable.

| | Inventory at June 10, 2009 | Sold to Chrysler Group | Auctioned to Date | Final Settlement with Chrysler Group | Written Off | Inventory at December 31, 2011 | $ Value of Sales to Date |
|---|---|---|---|---|---|---|---|
| **Revenue** | **3,605** | **29** | **3,496** | **53** | **27** | **-** | **$ 56,800,215** |
| Employee Lease | 2,758 | 27 | 2,661 | 46 | 24 | - | 42,777,596 |
| Lease Field | 334 | - | 328 | 4 | 2 | - | 6,000,668 |
| Lease Pool | 132 | 1 | 129 | 1 | 1 | - | 2,552,689 |
| Lease Govt/Govt Lease | 87 | - | 87 | - | - | - | 1,061,299 |
| Lease Studio/Studio Lease | 294 | 1 | 291 | 2 | - | - | 4,407,964 |
| **Non Revenue** | **3,992** | **2,922** | **1,070** | **-** | **-** | **-** | **$ 75,012,803** |
| Company Furnished | 102 | 59 | 43 | - | - | - | 2,395,325 |
| Competitive | 33 | 26 | 7 | - | - | - | 637,277 |
| Corporate Pilot | 2 | 2 | - | - | - | - | 35,000 |
| Courtesy | 68 | 23 | 45 | - | - | - | 1,617,997 |
| Demo Fleet | 190 | 182 | 8 | - | - | - | 3,360,727 |
| Field | 563 | 457 | 106 | - | - | - | 10,206,811 |
| Picture Studio/Studio Picture | 67 | 66 | 1 | - | - | - | 1,172,500 |
| Pool | 134 | 131 | 3 | - | - | - | 2,352,502 |
| Loaner Vehicles | 332 | 142 | 190 | - | - | - | 6,344,851 |
| Product Evaluation | 704 | 647 | 57 | - | - | - | 12,828,450 |
| Promotional | 582 | 517 | 65 | - | - | - | 10,660,738 |
| Test | 1,215 | 670 | 545 | - | - | - | 23,400,625 |
| **Total** | **7,597** | **2,951** | **4,566** | **53** | **27** | **-** | **$ 131,813,018** |

| | |
|---|---|
| Less: Incurred but not Collected | $ - |
| **Adjusted Total** | 131,813,018 |
| Allocation to DIP | 20% |
| **Net Proceeds to DIP** | **26,362,603.61** |

## C. Tax Refunds

Initial Tasks at Inception of Winddown

– The Liquidation Trust identified approximately $223.9 million of potential tax refund recoveries. These recoveries related to various tax years (1996-2010), various types of tax (income, sales & use, franchise), various jurisdictions (U.S., Canada, state, local) and various filing entities (including the Debtors, certain affiliates and former owners and affiliates). The Liquidation Trust reviewed over 500 individual tax returns in this analysis.

– There were numerous challenges in the process of preserving, pursuing and monetizing the tax refund receivables. At the outset, the Liquidation Trust had to rely on New Chrysler personnel to supply historical data for potential refund opportunities. New Chrysler's Tax Group had lost significant institutional knowledge due to headcount actions. The employees that remained were busy with their work for New Chrysler, sometimes resulting in delays in addressing data requests of the Liquidation Trust. The preparation of tax filings required the cooperation of multiple, and often adverse, parties, with several vested parties (the Debtors; former owner Cerberus; former owner Daimler) involved in the process.

Sometimes these third parties had their own competing interests to protect, and in many cases had information needed by (and otherwise unavailable to) the Liquidation Trust. Especially with these challenges, the task was daunting. Federal tax years were still open back to 1996, as were many state and local refunds that were impacted by the federal filings. Many States indicated a reluctance to issue any refunds until finalization of the federal audits and issuance of the approved adjustments from federal revenue agent's reports (RARs). In many cases, the federal RARs were needed to establish the state and local refunds.

– With this backdrop, the Liquidation Trust engaged in longstanding discussions with numerous taxing jurisdictions around the United States and in certain foreign jurisdictions, including Canada. Refund years at issue reached back to the 1990s and covered periods where Daimler and Cerberus each owned controlling interests in the Debtors. Seeking the return of tax refunds from cash-strapped governments sometimes has proven to be difficult. This difficulty sometimes has been further exacerbated by the additional complexities caused by the bankruptcy filing, the sale of assets to New Chrysler and the rights of certain former owners of the Debtors for prior tax years.

– In addition, over time, a dispute over the allocation of certain state and local income tax refunds arose between Daimler and the Liquidation Trust, involving tens of millions of dollars in refunds or potential refunds from state and local jurisdictions across the country. The dispute centered on the interpretation and implementation of a Tax Settlement Agreement approved by the Bankruptcy Court shortly after the Bankruptcy Case was filed in 2009. After a series of disputes were brought to the Bankruptcy Court in 2012, certain disputed tax refunds were placed in a segregated reserve. Ultimately, nearly $60 million of tax refunds were deposited in this reserve. Negotiations with Daimler to resolve these issues spanned more than two years and continued even after Daimler filed a complaint against the Liquidation Trust in June 2014. The matters in dispute involved highly complex legal and factual issues, involving thousands of pages of tax filings, multiple disparate tax jurisdictions and various contractual interpretation issues. In November 2014, these matters were resolved among the parties. A settlement agreement was approved by the Bankruptcy Court (Docket No. 8352) under which, among other things, $28.3 million of the funds in the segregated reserve and certain future collections of refunds were retained by the Liquidation Trust for the benefit of the First Lien Lenders (the "Daimler Settlement"). In addition, this settlement resolved virtually all of the remaining tax refund issues faced by the Liquidation Trust.

– On September 19, 2014, the First Lien Agent filed a motion to enforce the Winddown Orders and to direct the Liquidation Trust to turn over certain tax refunds (Docket No. 8326).

The tax refunds at issue generally arose from prepetition tax credits that became refunds in postpetition tax periods. Ultimately, the issue is an inter-creditor dispute about whether these amounts constitute collateral of the First Lien Lenders or the Government DIP Lenders (the "FLL/DIP Allocation Dispute"). The Liquidation Trust currently holds more than $24 million in refunds that are subject to this dispute. The Liquidation Trust understands that the First Lien Agent and the Government DIP Lenders are discussing the potential resolution of this dispute. This matter currently is set for hearing on July 14, 2015.

<u>Results</u>

- The Liquidation Trust recovered $25.7 million for the benefit of the Government DIP Lenders:

  - $4.9 million due to a 2009 refund for Debtor Old Carco International Services, S.A. (f/k/a Chrysler International Services, S.A.).

  - $4.3 million due to a 2009 refund for Alpha Holding.

  - $1.7 million in 2009 Federal excise tax refunds.

  - $9.5 million in Canadian tax refunds, including a Goods and Services Tax (GST) refund.

  - $3.8 million due to sales and use tax refunds filed in 31 different states and localities.

  - $1.5 million in other tax recoveries, including franchise and value added taxes (VAT).

- The Liquidation Trust recovered $175.1 million in tax refunds for the benefit of the First Lien Lenders:

  - Federal refunds of $84.9 million.

  - Various refunds payable under the terms of the Daimler Settlement totaling $28.3 million.

  - Illinois refunds of $16.2 million.

  - California refunds of $14.3 million.

  - Michigan net refunds of $8.5 million.

  - Ohio refunds of $6.0 million.

- New Jersey refunds of $1.9 million.

- Payments from Cerberus to resolve certain tax refund issues totaling $2.0 million.

- Pennsylvania refunds of $1.8 million.

- Florida refunds of $1.0 million.

- Other state and local refunds totaling $2.9 million.

– The Liquidation Trust recovered $24.0 million in federal tax refunds subject to the outcome of FLL/DIP Allocation Dispute.

– The Liquidation Trust completed and filed more than 150 RAR amended state filings, based on finalization of a 1996-2002 IRS federal audit.

– The Liquidation Trust completed and filed 100 required RAR amended state filings for tax years 2003-2007, which provided a basis for millions of dollars of state and local tax refunds as described above.

– The Liquidation Trust filed 20 tax returns for the Debtor entities for tax years 2009 to 2013.

– The Liquidation Trust amended the 2007-08 federal returns for certain Debtor entities.

– The Liquidation Trust resolved IRS claims upon the completion of the 2003-2007 audit.

## D. **Environmental Matters**

Initial Tasks at Inception of Winddown

– The Debtors negotiated the establishment of an Environmental Reserve as part of the Plan to resolve objections by the U.S. EPA and certain environmental authorities and to ensure that remediation would be funded for any property that could not be sold to a buyer that would be responsible for the condition of the property.

– The Liquidation Trust has managed the $15 million Environmental Reserve as required by the Plan and as described in the following chart.

**Environmental Reserves**
 *($ in millions)*

| Owned Property Reserve | Primary Funding | Excess Reserve Funding | Use of Funds |
|---|---|---|---|
| Ballinger | 3.0 | | |
| Detroit Axle | 0.5 | | |
| Kenosha | 10.0 | | 10.0 |
| St. Louis (North & South) | 1.0 | | |
| EPA Reserve | | | |
| Behr (up to $2 million) | 0.5 | 1.5 | 2.0 |
| Keck Orphan Reserve | | | |
| Keck Farm | | | |
| Other Owned Property | | | |
| FREC | | | |
| Huntsville | | 6.0 | |
| Mound Road | | 2.5 | |
| NVG | | 3.5 | |
| PROC | | 1.8 | |
| Toledo Jeep Parkway | | 2.5 | |
| TOTAL | 15.0 | 17.8 | 12.0 |

## Results

- The Liquidation Trust sold the nine DIP Collateral properties without having to use the Environmental Reserves. Each purchaser of a property demonstrated the ability to maintain the property in a safe environmental condition. The only transaction where money was used (from outside of the Environmental Reserve funds) to assist in a transaction was in the transfer of the property in Ballinger, Texas. This property was located in a severely economically depressed region of Texas and had significant known environmental issues. After protracted negotiations with several interested parties, the Liquidation Trust was able to transfer the property utilizing $1.6 million of funds with the consent of the U.S. Treasury to provide an incentive for the environmental clean-up of the property (and ultimately freeing up $3.0 million from the Environmental Reserve to be returned to the Government DIP Lenders).

- Purchasers of First Lien Collateral properties also have demonstrated the ability to properly maintain the properties. Because of the environmental condition of the site, the Liquidation Trust was unable to find a purchaser for the Kenosha Engine facility. After monetizing the equipment and other assets at the facility through a personal property auction and a

demolition, the property was abandoned to the City of Kenosha in accordance with the agreement of the Liquidation Trust, the First Lien Lenders, the City of Kenosha, the Wisconsin Department of Natural Resources ("WDNR") and the U.S. EPA, as approved by the Bankruptcy Court on October 28, 2011 (Docket No. 8015). As part of that resolution, $10 million of the Environmental Reserve was transferred to a Site Specific Account to help fund the environmental remediation of the property. Other activities at Kenosha included the following:

- ■ The Liquidation Trust worked closely with the WDNR and the City of Kenosha to develop an access agreement to allow the WDNR to test the Kenosha Engine Plant site as appropriate.

- ■ The Liquidation Trust managed the Kenosha site and its compliance with WDNR directives on a daily basis.

- ■ The Liquidation Trust monitored all equipment removal and demolition activities in Kenosha until the point of abandonment.

- ■ The Liquidation Trust created a removal plan for potentially contaminated soil piles at Kenosha.

- ■ The Liquidation Trust modernized and operated the remediation systems at the Kenosha site during ownership.

- ■ The Liquidation Trust coordinated hundreds of site visits for the WDNR and City of Kenosha to allow requested testing and monitoring.

- ■ The Liquidation Trust performed mirror testing of site samples at Kenosha originally performed by the City.

– The comprehensive agreement to abandon the Kenosha property to the City of Kenosha, included the following:

- ■ Negotiated the timing of the disbursement of the $10 million in funding from the Environmental Reserve.

- ■ Negotiated waivers, releases and representations and warranties.

- ■ Negotiated continued access for auction and removal of equipment.

- ■ Negotiated access for demolition.

- ■ Negotiated access for equipment removal.

- ■ Negotiated settlement of the WDNR's claims against the Liquidation Trust.

- ■ Filed a motion for Bankruptcy Court approval of the settlement.

- ■ Obtained all necessary regulatory approvals.

– As a result of the Liquidation Trust's successful sale of properties, it was able to fund the maximum of $2 million into the EPA Reserve, thereby resolving all issues relating to the Behr Dayton Site, as contemplated by the Plan.

– The remaining unused proceeds of the Environmental Reserve – totaling $3 million – will be returned to the Government DIP Lenders.

– The Liquidation Trust oversaw the continued remediation of the Huntsville facility until sale.

– The Liquidation Trust cooperatively worked with the Port Authority of Toledo, including providing access to test the former Chrysler Toledo property.

– The Liquidation Trust's work in preparing decommissioning reports on the Newark, St. Louis North, St. Louis South and the Detroit Axle facilities ensured that New Chrysler properly decommissioned facilities and left properties in an environmentally safe condition.

## E. **Tax Filings**

### Initial Tasks at Inception of Winddown

– The Liquidation Trust has been required to file numerous tax returns for itself and various entities that it owned (all of which now have been dissolved or abandoned).

– The Liquidation Trust prepared and filed in a timely manner 50 Chrysler LLC and other Debtor tax returns for tax years 2009-10.

– Open federal tax years from 1996 to 2007 required resolution to address substantial IRS claims in the original amount of over $23 billion filed in the Bankruptcy Cases. The final audit results for these years required amended federal and state filings, totaling approximately 600 amended returns. This administrative process was further complicated by application of various tax sharing or tax settlement agreements between the Debtors and their former owners.

### Results

- The final ruling for the 1992 to 2002 cycle federal Revenue Agent Report (RAR) adjustments was issued in November 2010.

- The Liquidation Trust prepared and filed 488 amended state tax returns related to the 1996-2002 final IRS audit adjustments.

- The Liquidation Trust prepared and filed approximately 100 amended state tax returns, as a result of the 2003 to 2007 final IRS audit adjustments.

- The Liquidation Trust prepared and filed approximately 50 amended state tax returns as a result of potential 2008-09 IRS audit adjustments.

- The Liquidation Trust prepared and filed four amended federal returns for 2007 and 2008 for non-consolidated filers.

- The Liquidation Trust filed five 2010 Liquidation Trust tax returns and related K-1's to report distributions.

- The Liquidation Trust filed disputed ownership fund returns for years 2010 to 2013.

- The Liquidation Trust filed all Liquidation Trust tax returns for years 2011 to 2013.

- The Liquidation Trust filed St. Louis County personal property tax returns for years 2010 to 2012.

- The Liquidation Trust filed approximately 50 Form 1099s each year from 2010 to 2013 for contractor work.

- The Liquidation Trust prepared and filed three 2010 corporate income tax returns for certain auto dealerships previously owned by the Debtors (Shakopee, Lowell, Brunswick).

- The Liquidation Trust prepared and filed six amended Canadian goods and services tax returns.

- The Liquidation Trust prepared and filed four amended Michigan fuel tax returns.

- The Liquidation Trust prepared and filed six amended Ohio sales and use tax returns.

- The Liquidation Trust prepared Form 1041s for Old Carco LLC.

- The Liquidation Trust prepared and filed all necessary federal or foreign returns for the following entities it previously owned (before they were abandoned by an order entered on January 14, 2015):   Alpha Holding (U.S.); Bonsol Holding S.a.r.l. (Luxembourg)

("Bonsol"); Nova Scotia Company ULC (Canada); and Old Carco Canada Holding ULC (Canada) ("Canada Holdings").

   – The Liquidation Trust prepared a balance sheet on a tax basis valuing every asset and liability remaining in the Liquidation Trust on the Effective Date. The Liquidation Trust then prepared and filed Form 1120, including valuing the basis in every transferred asset on a fair market value at the time of the Effective Date.

## F. Tax Claims & Tax Reserves

Initial Tasks at Inception of Winddown

   – There were 646 secured, administrative and priority ("SAP") tax claims filed against the Debtors for a total claim value of $25.5 billion. The Liquidation Trust was funded with $148 million pursuant to the Winddown Budget to resolve these claims and any additional tax claims that may be filed.

   – 214 of the 646 SAP tax claims asserted priority status for sales and use, income, franchise and other non-property tax claims in an asserted amount totaling $25.4 billion.

      ■ All 214 SAP priority tax claims have been resolved. Payments related to these priority tax claims totaled $9.1 million.

         – Eight claims with total asserted value of $1.4 billion were filed by the State of Michigan against various entities for single business taxes. These tax claims were resolved and settled for $1 million.

         – Three claims with total asserted value of $37 million were filed by the State of Washington for sales and business taxes. These claims were resolved and settled for $2.5 million.

         – Five claims with total asserted value of $11 million were filed by the State of Louisiana for corporate income taxes. These claims were resolved and settled for $3.1 million.

         – A claim with an asserted value of $2.3 million was filed by the Texas Comptroller of Public Accounts for franchise taxes. This claim was resolved and settled for $2 million.

- Three claims with total asserted value of $4 million were filed by the State of Florida for sales and use taxes. These claims were resolved and settled for $125,000.

- 12 claims with total asserted value of $4 million were filed by the State of Tennessee for franchise taxes. These claims were resolved and settled for $114,000.

- 18 claims with total asserted value of $23.5 billion were filed by the U.S. Department of the Treasury (i.e., the IRS) against various entities for 1993 to 2009 corporate income taxes pending final audit of federal tax returns. These claims were resolved and withdrawn without any liability.

- Three claims with total asserted value of $23 million were filed by the State of New York for 1998 to 2009 corporate income taxes. These claims were resolved and settled for $3 million.

- Seven claims with total asserted value of $16 million were filed by the State of California for 1993 to 2010 franchise taxes. These claims were resolved and settled for $150,000.

- Three claims with total asserted value of $18 million were filed by the State of Ohio for 2005 to 2009 sales and use taxes. These claims were resolved with no liability to the Liquidation Trust. Ultimately, the State of Ohio paid significant refunds to the Liquidation Trust.

- The remaining 151 claims, including duplicate claims, with total asserted value of approximately $800 million were resolved and settled for approximately $300,000.

- Notably, very few of these claims required claim objections or other litigation to be resolved.

- Another 182 of the 646 SAP tax claims asserted priority status for unsecured property taxes with a total asserted value of $76 million. These tax claims relate to personal property located in Indiana, Missouri, Virginia and Kansas that generally are non-lienable and have unsecured priority tax status. All of the unsecured priority tax claims of this type have been resolved for total payments of $11.8 million, including the following:

- ■ An asserted claim of $31.2 million filed by Howard County, Indiana was resolved (with ultimate tax liabilities shared with New Chrysler). The Liquidation Trust's portion of tax liabilities was $7.9 million of unsecured priority tax and $7.5 million of secured property taxes.

- ■ 90 claims filed by St. Louis County, Missouri with a total asserted value of $9.8 million were settled for $3.6 million.

- ■ The remaining 91 unsecured priority property tax claims relate to tooling, dealer signs and other personal property. These claims were settled for approximately $300,000.

- – 250 of the 646 SAP tax claims asserted secured tax status and total value of $15 million. Any real property taxes related to real property transferred to New Chrysler for the year 2009 were split between the Liquidation Trust (for the period prior to June 9, 2009) and New Chrysler (for the period after June 9, 2009, i.e., the date New Chrysler purchased such properties). In most cases, New Chrysler would receive the property tax bills, pay all taxes to the taxing authorities and seek reimbursement from the Debtors for the portion related to the period prior to the sale date. Payments related to secured property tax claims, including the secured property tax portion of Howard County, Indiana's claim, totaled $11.7 million.

Results

- – In sum, all 649 SAP tax claims have been resolved, for a total settlement cost of $46.2 million compared to the claimed amounts of $25.5 billion (or $1.8 billion (after eliminating duplicate claims).

## G.  Other Secured, Administrative and Priority (SAP) Claims

Initial Tasks at Inception of Winddown

- – As a part of the Plan, all valid SAP claims must be paid in full from the appropriate Trust Accounts funded by the DIP Collateral, or from other applicable collateral (e.g., upon the sale of First Lien Collateral for applicable secured claims).

- – There were more than 4,000 SAP Claims filed against the Debtors totaling approximately $236.3 billion, including the tax claims described above in Section F.

<u>Results</u>

– To date the Liquidation Trust has resolved all claims with a total asserted value of $236.3 billion, including:

   ▪ Successfully resolved all of the Administrative Claims under section 503(b)(9) of the Bankruptcy Code with an asserted value of $421 million for total payments of $509,936.

   ▪ Successfully resolved dealer claims with an asserted value of $159 million for total payments of $504,998.

   ▪ Successfully resolved Reclamation Claims with an asserted value of $11.7 million at no cost to the Liquidation Trust.

   ▪ Successfully resolved Secured Trade Claims with an asserted value of $1 million for total payments of $133,002.

   ▪ Successfully resolved employee claims with an asserted value of $200,000 at no cost to the Liquidation Trust.

– The only unresolved SAP claim is a secured claim asserted by Safeco Insurance Company of America ("Safeco"). Safeco issued various appellate bonds to the Debtors, including a bond to secure the appeal of a judgment in California. To obtain the bond, the Debtors posted cash collateral with Safeco. The Debtors ultimately settled the judgment and appeal, and the settlement was approved by an order of the Bankruptcy Court entered on September 24, 2009 (Docket No. 5618) (the "Settlement Order"). Per the Settlement Order, the plaintiffs' attorney filed an Acknowledgement of Full Satisfaction of Judgment and an Exoneration of Bond to permit the excess collateral held by Safeco to be returned to the Debtors. Unfortunately, the Exoneration of Bond was not accepted by the appellate court. Despite years of effort, additional administrative steps have been necessary to complete the exoneration of the relevant bond. These steps are now in process. Once completed, the excess collateral will be returned to the Liquidation Trust, and Safeco's secured claim will be resolved without any further payment from the Liquidation Trust.

**H.  Other Recoveries**

<u>Initial Tasks at Inception of Winddown</u>

- The Liquidation Trust originally forecast $2 million as an estimate for the recovery of utility deposits, the closing of bank and escrow accounts, and any other recoveries.

<u>Results</u>

- All of these recoveries were initially unknown at the date of the sale of the Debtors' assets to New Chrysler.  Currently, the Liquidation Trust has recovered $23.6 million as follows:

  - $11.0 million was recovered due to the release of excess collateral held by Safeco (with additional amounts expected as described above).

  - $4.7 million of proceeds from the redemption of Rabbi Trust investments.

  - The Liquidation Trust conducted a cash receipts audit to investigate whether all funds received by New Chrysler had properly been transferred to the Liquidation Trust. Ultimately, the Liquidation Trust negotiated and settled this issue with New Chrysler for a cash payment of $5.3 million to the Liquidation Trust.

  - $0.8 million in cash was recovered from the closure of certain Debtor-owned auto dealerships.

  - $0.25 million in cash has been ordered to be paid to the Liquidation Trust from the remaining unused portion of a prepetition settlement fund.

**I.  Administration**

<u>Initial Tasks at Inception of Winddown</u>

- The administrative tasks in a project of this scale are immense and include bankruptcy filings, reporting to the Government DIP Lenders and the First Lien Lenders, accounting for thousands of transactions, cash management, tax reporting, coordination with dozens of government entities and numerous other activities and communications with various governmental and other third parties.

Activities Performed

   – The Liquidation Trust and its professionals have performed and managed all accounting activities, reporting activities and final documentation and dissolution of the legal entities. These activities include:

- Bankruptcy Court filings.

- Quarterly United States Trustee Reports.

- Monthly and Quarterly Government DIP Lender Reports.

- Monthly First Lien Lender Reports.

- Daily Cash Accounting.

- Weekly cash flow forecasting.

- Monthly closing of general ledger.

- Internal cash reconciliation.

- Internal auditing.

- Collateral compliance with Plan.

- Distributions to beneficiaries.

- Employee payroll, payroll taxes and W-2s.

- Form 1099 preparation for hundreds of vendors.

- Reconciliation of ordinary course professional invoices and compliance with related court orders.

- Reconciliation of professional fee applications and compliance with related court orders.

- Preparation for court hearings as necessary.

- Enforcing New Chrysler's compliance with Transition Services Agreement.

- Document maintenance and retention.

- Establishment, organization and maintenance of a data room for environmental records, both in electronic form and in hard copy.

- Dissolution of dozens of legal entities, and abandonment of others.

- Foreign tax filings for owned legal entities (Bonsol, Alpha Holding and Canadian Holdings) before abandonment.

- Ongoing communications, coordination and presentations to various state and local governmental agencies and task forces.

## J. Unplanned Activities

Throughout the administration of the winddown process, there have been a number of activities that required an investment in time that was not anticipated when the Liquidation Trust was established. Virtually all of these matters have been successfully concluded.

Activities Performed to Date

Unanticipated activities included the following:

- **AMC Retirees** – Efforts to address and resolve AMC retiree benefits issues.

- **SIGTARP Audit** – Activities to respond to Special Inspector General for the Troubled Asset Relief Program (SIGTARP) audit and related inquiries that continued beyond the projected end date.

- **Dealer Matters** – Various dealer appeals and requests for reconsideration of relief granted by the Bankruptcy Court, and discovery disputes in dealer litigation.

- **Dealer Enforcement Litigation** – Litigation and appeals to address dealers' violations of the Sale Order and the Dealer Rejection Order.

- **Evaluation of Recovery Actions** – Work in April 2011 to evaluate and prepare for possible pursuit of preference actions under section 547 of the Bankruptcy Code.

- **Miscellaneous DIP Matters** – Other unanticipated or extraordinary matters (including litigation) not included in original work plan or budget.  These matters included:

  - Canada GST Refund – Unanticipated disputes with New Chrysler contesting treatment of CDN $8.5 million Goods and Services Tax refund that is DIP Collateral, now resolved in favor of the Liquidation Trust.

- Domel Litigation – Efforts to collect $1.1 million cost judgment in a personal injury case in California.

- Guillot Litigation – Resolution of litigation and appeal issues to collect $300,000 in excess bond collateral.

- Mraz Litigation – Disputes with plaintiffs to resolve litigation and free up $2.5 million in bond collateral, including work to address violations of initial agreements and court orders.

- Pullano Litigation – Litigation with claimant after violation of bankruptcy stay and bankruptcy court orders, resolved in favor of the Liquidation Trust.

- Retiree Lawsuit – Evaluation of lawsuit against Cerberus and Daimler potentially implicating treatment of employee benefit obligations in the chapter 11 case.

- Spears Litigation – Discovery disputes with plaintiffs in environmental action.

- Taurus Litigation – Efforts to pursue a portion of a costs judgment claimed by New Chrysler.

- Abrahamson Litigation – Litigation with landlord claimant seeking, among other things, damages for fraud.

- Sale-Related Litigation – Participation in multiple adversary proceedings relating to issues arising out of sale of assets to New Chrysler.

- Numerous other unanticipated contested matters and adversary proceedings.

## **CONCLUSION**

The Liquidation Trust, under the guidance of the Liquidation Trustee and with the assistance of its professionals, has substantially completed its work. It has taken all steps required by the Plan. It has addressed each challenge presented to it as efficiently as possible. Recoveries for the Government DIP Lenders and the First Lien Lenders are well above projections, and all real property assets have been disposed of in a responsible manner. The Liquidation Trust now has substantially liquidated its assets, collected receivables and made distributions required by the Plan. It has resolved all major disputes. Given the scope of the tasks required, the Liquidation Trust submits that it has achieved a result that was expeditious and efficient and that substantially benefitted the Liquidation Trust's beneficiaries.

## <u>EXHIBIT B</u>

**Daimler Litigation Conclusion Notice**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman

Attorneys for Old Carco Liquidation Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------- x
                                                            :
In re                                                       :    Chapter 11
                                                            :
Old Carco LLC                                               :    Case No. 09-50002 (SMB)
(f/k/a Chrysler LLC), et al.,¹                              :
                                                            :    (Jointly Administered)
                              Debtors.                      :
                                                            :
----------------------------------------------------------- x
```

### NOTICE OF CONCLUSION OF DAIMLER LITIGATION
### AND TREATMENT OF THE DAIMLER FUND BALANCE

### PLEASE TAKE NOTICE OF THE FOLLOWING:

*The Plan*

       1.    On April 23, 2010, this Court (the "Bankruptcy Court") entered an order

(Docket No. 6875) (the "Confirmation Order") confirming the Second Amended Joint Plan of

---

¹      A second amended list of the above-captioned debtors (the "Debtors"), their addresses and tax
identification numbers is located on the docket for Case No. 09-50002 (SMB) (Docket No. 3945) and can
also be found at www.chryslerrestructuring.com.

CLI-2117845v7

Liquidation of Debtors and Debtors in Possession, as Modified (collectively with all exhibits thereto, the "Plan").[2]

2.    On April 30, 2010 (the "Effective Date"), the Plan became effective in accordance with its terms, and Old Carco Liquidation Trust (the "Liquidation Trust") was established as the successor in interest to the Debtors.

### Establishment of the Daimler Fund

3.    Among other things, the Plan (and the Winddown Orders entered in the Debtors' Chapter 11 Cases) provided for the establishment of the "Daimler Fund"[3] to pay for certain "Daimler Litigation Costs"[4] incurred or to be incurred in connection with "the adversary proceeding initiated in the Bankruptcy Court and styled prior to the Effective Date as

The Official Committee of Unsecured Creditors of Old Carco LLC (f/k/a Chrysler LLC) v. Daimler AG (f/k/a DaimlerChrysler AG), et al., Adversary Proceeding No. 09-00505 (AJG) (Bankr. S.D.N.Y.)…." (the "Daimler Litigation"). See Plan, § X.A.69.

---

[2]    The Plan was further modified by the Order, Pursuant to Section 1127(b) of the Bankruptcy Code, Approving Technical Modification of Confirmed Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified, dated April 28, 2010 (Docket No. 6923). Capitalized terms used but not defined herein have the meanings given to them in the Plan.

[3]    The term "Daimler Fund" is defined in the Plan as "the fund established pursuant to the Winddown Orders to fund the Daimler Litigation Costs. Pursuant to the Plan, the Daimler Fund was funded from the First Lien Daimler Contribution and the Committee Car Proceeds. See Plan, § X.A.67.

[4]    The term "Daimler Litigation Costs" is defined in the Plan as "the actual out-of-pocket costs, disbursements and litigation expenses incurred by:  (a) the Creditors' Committee from and after September 1, 2009 through and including the Effective Date; and (b) the Liquidation Trust after the Effective Date, for the sole purposes of prosecuting the Daimler Litigation, including (i) the reasonable fees and expenses of the Litigation Manager solely as set forth in Section IV.H.4 [of the Plan] and (ii) the Liquidation Trust's expert witnesses, translators or other non-legal professionals related to the Daimler Litigation, but excluding any Contingency Fees." See Plan, § X.A.70.

4.    Based on the funding mechanism established in the Winddown Orders and the Plan, the Daimler Fund was established and was funded with approximately $9.85 million from the First Lien Daimler Contribution and the Committee Car Proceeds.[5]

### *The Conclusion of the Daimler Litigation*

5.    After the Effective Date, the Liquidation Trust was substituted for the Creditors' Committee as the Plaintiff in the Daimler Litigation.  See Plan, at § IV.G.2.  From and after the Effective Date, the Daimler Litigation was prosecuted on behalf of the Liquidation Trust under the management of the Litigation Manager and Contingency Fee Counsel acting at his direction.  See Plan, at §§ IV.G.2.b.i; IV.H.3.  The Liquidation Trustee received periodic reports from the Litigation Manager, but, pursuant to the Plan and the Litigation Manager Agreement, the Liquidation Trustee had no role in managing or prosecuting the Daimler Litigation.  See Plan, at § IV.G.2.b.iii.

6.    As described in the Plan and the related Disclosure Statement with Respect to Second Amended Plan of Liquidation, dated January 22, 2010 (Docket No. 6273) (the "Disclosure Statement"), the potential recoveries of holders of General Unsecured Claims against the Debtors were contingent on, among other things, the successful prosecution or settlement of the Daimler Litigation.  In particular, under the Plan, holders of Allowed General Unsecured Claims would share Pro Rata in "Available Net Daimler Proceeds"[6] received by Liquidation Trust in connection with the Daimler Litigation, but only if the Available Net Daimler Proceeds exceed the Minimum Distribution Threshold of $25 million (or such other

---

[5]    The First Lien Daimler Contribution was $5 million and the amount of the Committee Car Proceeds totalled approximately $4.85 million.

[6]    Section X.A.72 of the Plan defines "Daimler Proceeds" as "any and all proceeds actually received by the Debtors or the Liquidation Trust on account of the Daimler Litigation but excluding the Cash in the Daimler Fund."  Section X.A.14 defines "Available Net Daimler Proceeds" as the Daimler Proceeds after various adjustments, such as the reduction for certain fees and costs payable from the Daimler Proceeds and other permitted uses of such funds.

amount set by order of the Bankruptcy Court).  See Disclosure Statement, at S-1; Plan,

at § II.B.6.a.

7.       On May 12, 2011 and May 17, 2011, the Bankruptcy Court entered its

order (Adv. D.I. 74) (the "Bankruptcy Court Order") granting Daimler AG's motion to dismiss

all counts of the Second Amended Complaint filed in the Daimler Litigation, with prejudice.

The United States District Court for the Southern District of New York (the "District Court")

affirmed the Bankruptcy Court Order pursuant to an order entered on November 22, 2011(Dist.

Ct. D.I. 14) (the "District Court Order").  The United States Court of Appeals for the Second

Circuit affirmed the District Court Order pursuant to a summary order and judgment entered on

January 30, 2013 (2d Cir. D.I. 101) (the "Second Circuit Order").

8.       Following the entry of the Second Circuit Order, neither the Litigation

Manager on behalf of the Liquidation Trust nor any other party filed a timely petition for a grant

of certiorari with the Supreme Court of the United States.  The deadline to file a petition for

certiorari regarding the Second Circuit Order was April 30, 2013.

9.       As a result of the foregoing, the Bankruptcy Court Order is a Final Order

that (a) concludes the Daimler Litigation and (b) results in no Daimler Proceeds being recovered

by the Liquidation Trust.

### No Recovery for General Unsecured Claims

10.      Because the Liquidation Trust did not recover any Daimler Proceeds on

account of the Daimler Litigation, there will be no distributions to holders of Allowed General

Unsecured Claims against the Debtors' chapter 11 estates in these Chapter 11 Cases.  See Plan,

§ II.B.6.a.

### *Termination of the Litigation Manager and Contingency Fee Counsel*

11.    As a result of the conclusion of the Daimler Litigation, the Litigation Manager's role is concluded, and he has been relieved of any further responsibilities under the Plan and the Litigation Manager Agreement.  See Plan at § IV.H.5, Litigation Manager Agreement at Article IX.  Likewise, Contingency Fee Counsel's representation of the Liquidation Trust has been terminated.

12.    On May 8, 2013, the Liquidation Trust sent a letter to the Litigation Manager (the "Termination Letter") confirming (a) the termination of the role of the Litigation Manager and (b) the termination of the Litigation Manager Agreement in accordance with its terms.  By the Termination Letter, the Liquidation Trust also requested that the Litigation Manager inform the Contingency Fee Counsel in the Daimler Litigation, who acted under the Litigation Manager's direction, that (a) counsel's engagement is concluded, (b) the attorney-client relationship with the Liquidation Trust is concluded and (c) counsel should return case files (including any original documents and records of Daimler Litigation Costs maintained pursuant to Section 8.1 of the Litigation Manager Agreement) to the Liquidation Trust.

13.    In addition, the Termination Letter requested that the Litigation Manager and Contingency Fee Counsel provide final bills for any valid Daimler Litigation Costs chargeable against the Daimler Fund.  The Liquidation Trust paid the final bills received in response to the Termination Letter.

### *The Treatment of the Daimler Fund Balance*

14.    Because the Daimler Litigation was concluded on a motion to dismiss and related appeals without further discovery, most of the Daimler Fund was not used.  The Plan defines any excess proceeds remaining in the Daimler Fund upon the conclusion of the Daimler

Litigation as the "Daimler Fund Balance."[7]  The Plan provides that, "[a]t the conclusion of the Daimler Litigation and after payment of the Daimler Litigation Costs, any Daimler Fund Balance will be subject to treatment as set forth in the Plan, and the Daimler Fund may be closed."  Plan, at § IV.F.3.b.

15.    As of July 10, 2013, all Daimler Litigation Costs were paid by the Liquidation Trust; and the Daimler Fund Balance was $9,009,560.97.

16.    Multiple provisions of the Plan require the Liquidation Trust to return the First Lien Daimler Fund Balance to the First Lien Lenders immediately upon the conclusion of the Daimler Litigation.  See Plan, § X.A.113 ("The First Lien Daimler Fund Balance (if any) is to be repaid to the First Lien Agent promptly upon the conclusion of the Daimler Litigation and payment of all Daimler Litigation Costs…."); § IV.G.2.b.viii ("As promptly as possible after the … conclusion of the Daimler Litigation, … the First Lien Daimler Fund Balance will be transferred to the First Lien Agent.").

17.    The "First Lien Daimler Fund Balance" is the portion of the Daimler Fund Balance equal to the percentage of the Daimler Fund that was initially funded by the First Lien Lenders pursuant to the First Lien Daimler Contribution.  See Plan, § X.A.113.  Because the First Lien Daimler Contribution was approximately 50.77582% of the total amount deposited into the Daimler Fund, the First Lien Daimler Fund Balance was $4,574,678.41 (i.e., $9,009,560.97 multiplied by 50.77582%).  The First Lien Lenders agreed with the Liquidation Trust's calculation of the First Lien Daimler Fund Balance, and the First Lien Daimler Fund Balance was distributed to the First Lien Agent on July 11, 2013.

---

[7]    Section X.A.68 of the Plan defines "Daimler Fund Balance" as "the remainder of the Daimler Fund if, at the conclusion of the Daimler Litigation …, the aggregate Daimler Litigation Costs have totaled less than the amount deposited in such fund."

18.    Because no Daimler Proceeds were recovered in connection with the

Daimler Litigation, only the "General Unsecured Daimler Fund Balance"[8] remains in the

Daimler Fund following the return of the First Lien Daimler Fund Balance to the First Lien

Lenders.  The amount of the General Unsecured Daimler Fund Balance (and thus the amount of

the Daimler Fund Balance) is approximately $4.44 million.

19.    Section IV.G.2.b.viii of the Plan provides that "[a]s promptly as possible

after the Daimler Proceeds Receipt Date [i.e., a date tied to the receipt of at least $25 million on

account of the Daimler Litigation, which date will never occur]  and the conclusion of the

Daimler Litigation, … the General Unsecured Daimler Fund Balance, if any, will be deposited

into the Additional Proceeds Account …."[9]  On July 11, 2013, the Liquidation Trust used the

General Unsecured Daimler Fund Balance to fund the Additional Proceeds Account, and the

Daimler Fund was closed.  The funds in the Additional Proceeds Account are free and clear of all

liens and claims, including any liens and claims of the Government DIP Lenders.  See, e.g., DIP

Lender Winddown Order, at ¶ 9(a) ("20% of the Net Remaining Share shall be transferred to the

Daimler Fund … for the benefit of the Creditors' Committee free and clear of all liens and

claims, including the DIP Lenders' liens and claims…."); Plan, at § IV.A.1 (providing that

"Liquidation Trust Assets," which assets include the Additional Proceeds Account, vest in the

Liquidation Trust "free and clear of all Liens, Claims and Interests.").

20.    Following the deposit of the General Unsecured Daimler Fund Balance

into the Additional Proceeds Account, Section IV.G.2.b.ix of the Plan provides that the

---

[8]    The Plan defines the "General Unsecured Daimler Fund Balance" as the "Daimler Fund Balance minus the First Lien Daimler Fund Balance."  Plan, § X.A.126.

[9]    The Plan defines the "Additional Proceeds Account" as "the certain account established by the Debtors or the Liquidation Trust, as applicable, managed by the Liquidation Trust from and after the Effective Date and funded from:  (a) the Daimler Proceeds; and (b) the General Unsecured Daimler Fund Balance, if any." Plan, § X.A.4.

Liquidation Trust will "use … any General Unsecured Daimler Fund Balance to:  (A) establish the General Unsecured Claims Reserve[10] and (B) fund any identified or projected deficiencies in the Trust Accounts as determined by the Liquidation Trustee."  Plan, § IV.G.2.b.ix. Section 4.3.3 of the Liquidation Trust Agreement between the Debtors and the Liquidation Trustee, dated April 30, 2010, similarly provides that "the Liquidation Trust will use ... any General Unsecured Daimler Fund Balance, to (i) establish the General Unsecured Claims Reserve and (ii) fund any identified or projected deficiencies in the Trust Accounts, as determined by the Liquidation Trustee."   Because no General Unsecured Claims will be reconciled or paid, there will not be a General Unsecured Claims Reserve.

21.    In accordance with Section IV.G.2.b.ix of the Plan and Section 4.3.3 of the Liquidation Trust Agreement, the Liquidation Trustee has determined to hold the funds deposited in the Additional Proceeds Account for use to cover various identified and projected potential deficiencies in the Trust Accounts, as necessary.  Among other things, these funds may be used for some or all of the following purposes:  (a) renew, extend or otherwise purchase necessary insurance for the Liquidation Trust; (b) pay fees owing to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (c) pay fees and reimburse expenses incurred by the claims and noticing agent appointed in the Chapter 11 Cases; (d) fund costs associated with the preparation of necessary tax returns and related tax advice; (e) provide additional funding for the Liquidation Trust's core professionals and any additional professionals or other consultants that the Liquidation Trustee determines are necessary or appropriate;[11] (f) fund the compensation and

---

[10]    The Plan defines "General Unsecured Claims Reserve," in relevant part, as "the reserve … established from the Net Daimler Proceeds and any General Unsecured Daimler Fund Balance to fund:  (a) the activities necessary to reconcile, litigate or otherwise resolve Disputed General Unsecured Claims; and (b) any costs to make distributions on account of Allowed General Unsecured Claims."  Plan, at § X.A.125.

[11]    In accordance with the Agreed Order Pursuant to Sections IV.B.3.b and X.A.224 of the Second Amended Joint Plan of Liquidation and the Liquidation Trust Agreement (A) Modifying the Winddown Budget and

expenses of the Liquidation Trustee, consistent with the terms of the Liquidation Trust

Agreement; and (g) establish a reserve for contingencies.

22.    The unused balance of the Additional Proceeds Account remaining after

the funding of the identified and projected deficiencies in the Trust Accounts by the Liquidation

Trustee will be allocated and distributed in accordance with the Plan.  In particular, the Available

Net Daimler Proceeds will be distributed to one or more Charitable Organizations in accordance

with Section II.A.c.iv of the Plan.

---

(continued…)

   Authorizing Further Use of Cash Collateral by RJM I, LLC as Liquidation Trustee on Behalf of Old Carco
   Liquidation Trust and (B) Granting Related Relief (Docket No. 7974) (the "Winddown Budget Order"),
   entered by the Bankruptcy Court on August 25, 2011, the Liquidation Trust entered into fixed fee
   arrangements with certain of its core professionals (e.g., Jones Day; Capstone Advisory Group) in
   connection with the liquidation of the DIP Collateral.  Because the funds deposited in the Additional
   Proceeds Account are not DIP Collateral under the Winddown Orders and the Plan, these funds are not
   subject to the Winddown Budget Order and may be used, in the discretion of the Liquidation Trustee, to
   supplement the fixed fee arrangements entered into by the Liquidation Trust and its professionals in
   connection therewith.

Dated: July 11, 2013
        New York, New York

Respectfully submitted,


/s/ Corinne Ball
Corinne Ball
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR
OLD CARCO LIQUIDATION TRUST

**<u>EXHIBIT C</u>**

**Old Carco/Alpha Closing Report**

NAI-102623167v16

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                              :

In re                                     :    Chapter 11

                                         :

Old Carco LLC                        :    Case No. 09-50002 (AJG)

(f/k/a Chrysler LLC), *et al.*,         :

                                         :    (Jointly Administered)

                           Debtors.       :

                                         :

---------------------------------------------------------------x

## CLOSING REPORT FOR OLD CARCO LLC AND ALPHA HOLDING LP[1]

       1.      The following is a breakdown of certain fees and expenses in the

above-captioned chapter 11 cases:[2]

---

[1]    Capitalized terms not otherwise defined herein have the meaning given to them in the annexed *Motion of Old Carco Liquidation Trust for the Entry of a Final Decree, Pursuant to Section 350 of the Bankruptcy Code, Bankruptcy Rule 3022 and Local Bankruptcy Rule 3022-1, (A) Closing the Chapter 11 Cases of Old Carco LLC and Alpha Holding LP, (B) Terminating the Appointment of the Claims and Noticing Agent, (C) Granting Releases and (D) Granting Related Relief* (the "Case Closing Motion").

[2]    This report relates to the following Debtors in the above-captioned cases (collectively, the "Closed Debtors"):  Old Carco LLC (Case No. 09-50002); and Alpha Holding LP (Case No. 09-50025).  A previous closing report (the "2010 Closing Report") for each of the other above-captioned Debtors (collectively, the "Previously Closed Debtors") was filed with the Court on July 21, 2010, and a final decree (the "2010 Final Decree") closing the Previously Closed Debtors' cases (Docket No. 7317) was entered on August 4, 2010.

### Fees and Expenses (from Inception of Chapter 11 Cases)[3]

| Professional[4] | Requested Amount | Paid Amount | Remaining Amount |
|---|---|---|---|
| A. Fees for Jones Day (Counsel to the Debtors and the Liquidation Trust): | $44,674,670[5] | $44,403,245 | $271,425 |
| B. Other Professional Fees: | | | |
| (1) American Appraisal Associates, Inc., Appraiser for the Debtors | $17,105 | $17,105 | $0.00 |
| (2) Cahill Gordon & Reindel LLP, Special Counsel for the Board of Managers of Old Carco LLC (f/k/a Chrysler LLC) | $784,219 | $784,219 | $0.00 |
| (3) Capstone Advisory Group, LLC ("Capstone"), Financial Advisors for the Debtors and the Liquidation Trust | $43,917,154[6] | $43,476,984 | $440,170 |
| (4) Alan Chapell, Consumer Privacy Ombudsman | $47,880 | $47,880 | $0.00 |
| (5) Dykema Gossett PLLC ("Dykema"), Special Counsel for the Debtors[7] | n/a | $1,018,453[8] | n/a |

---

[3] The amounts included in the table below represent fees and expenses incurred and paid through May 31, 2015. The fees and expenses detailed herein do not include fees paid to Epiq Bankruptcy Solutions, LLC, the Debtors' claims and noticing agent, which totaled $10,664,624 from the inception of the Chapter 11 Cases.

[4] Consistent with the 2010 Closing Report, because the Debtors' chapter 11 cases have been administered jointly (as well as substantively consolidated for purposes of the Plan), (a) the "Fees for Debtors' Counsel Jones Day," (b) the "Other Professional Fees" and (c) the "Aggregate Expenses Paid to Professionals" are set forth herein in the aggregate for all Debtors.

[5] Of the total fees requested by Jones Day, (a) $776,488.13 are fees for matters that were paid by Chrysler Group LLC n/k/a Fiat Chrysler Automobiles and (b) $10,833,435.00 are fees incurred on matters funded by the First Lien Lenders (as such term is defined in the Plan). The total fees requested by Jones Day do not include an additional $750,000 fee that the Liquidation Trustee has agreed to pay Jones Day for certain post-Effective Date services, which fees are the subject of the *Motion of Jones Day for an Order Approving Second Supplemental Fee Agreement Between Jones Day and Old Carco Liquidation Trust*, filed concurrently with the Case Closing Motion.

[6] Of the total fees requested by Capstone, $9,214,754.00 represents fees for matters funded by the First Lien Lenders.

[7] As of the date of this Closing Report, Dykema has not filed a final fee application.

[8] This amount represents the amount paid to Dykema on account of fees and expenses.

| Professional[4] | Requested Amount | Paid Amount | Remaining Amount |
|---|---|---|---|
| (6) Freshfields Bruckhaus Deringer LLP ("Freshfields"), Special Counsel for the Debtors | $1,370,572 | $1,366,722 | $0.00[9] |
| (7) Greenhill & Co., LLC, Investment Banker for the Debtors | $1,102,951 | $1,102,951 | $0.00 |
| (8) Kramer Levin Naftalis & Frankel LLP, Counsel for the Official Committee of Unsecured Creditors | $5,993,458 | $5,993,458 | $0.00 |
| (9) Mesirow Financial Consulting, LLC, Financial Advisor to the Official Committee of Unsecured Creditors | $3,076,839 | $3,076,839 | $0.00 |
| (10) Pachulski Stang Ziehl & Jones LLP, Conflicts Counsel for the Official Committee of Unsecured Creditors | $426,840 | $426,840 | $0.00 |
| (11) PricewaterhouseCoopers LLP, Tax Advisors for the Debtors | $1,534,176 | $1,534,176 | $0.00 |
| (12) Schulte Roth & Zabel LLP, Special Counsel for the Debtors | $5,148,047 | $5,148,047 | $0.00 |
| (13) Togut, Segal & Segal LLP, Conflicts Counsel for the Debtors | $4,509,553 | $4,509,553 | $0.00 |
| (14) The Siegfried Group, LLP, Accounting Resource Provider for the Debtors | $104,797 | $104,797 | $0.00 |
| Total Other Professional Fees: [10] | $69,052,044 | $68,608,024 | $711,595[11] |
| C. Aggregate Expenses Paid to Professionals:[12] | $3,981,564 | $3,978,573[13] | $2,991 |

---

[9]   The Debtors inadvertently paid Freshfields a total amount of $1,719,285, of which Freshfields refunded $329,133 in the week of October 2, 2009 and $6,685 in the week of April 9, 2010. Therefore, and because of the eurodollar exchange rate, the Debtors believe that no further amounts are due to Freshfields although Freshfields was paid $1,366,722 on account of fees that amounted to $1,370,572.

[10]  The amount of Total Other Professional Fees paid does not include the fees paid to Dykema.

[11]  The amount of Total Other Professional Fees remaining assumes that no fees remain due to Freshfields. See also footnote 9 above.

[12]  The amounts of Aggregate Expenses Paid to Professionals do not include the expenses reimbursed to Dykema.

| Professional[4] | Requested Amount | Paid Amount | Remaining Amount |
|---|---|---|---|
| D.  Trustee Fees: | n/a | n/a | n/a |
| E.  Fee for Attorney for Trustee: | n/a | n/a | n/a |

### Confirmation of the Plan

2.      On April 23, 2010, the Court entered the *Order Confirming the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified* (Docket No. 6875) (the "Confirmation Order").  Attached to the Confirmation Order as Annex I is the confirmed *Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified, which was further modified by the Order, Pursuant to Section 1127(b) of the Bankruptcy Code, Approving Technical Modification of Confirmed Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified*, dated April 28, 2010 (Docket No. 6923) (collectively with all exhibits thereto, the "Plan").  Pursuant to the Plan and the Confirmation Order, the Debtors' estates were substantively consolidated for purposes of implementing the Plan.  See Plan, Section VII.A; Confirmation Order, ¶¶ 15-16.

### Steps Taken to Consummate Plan

3.      On April 30, 2010 (the "Effective Date"), the Plan was consummated within the meaning of section 1101(2) of the Bankruptcy Code.  As of this Effective Date, Old Carco was dissolved in accordance with the Plan.  The procedures for closing the Alpha case approved in the 2010 Final Decree contemplated that Alpha would be dissolved.  However, Alpha was not dissolved, and instead was abandoned pursuant to the *Order, Pursuant to*

---

(continued…)

[13]     Of the Total Aggregate Expenses Paid, (a) $11,241.67 of Jones Day's expenses was incurred on matters funded by Chrysler Group LLC n/k/a Fiat Chrysler Automobiles, (b) $147,690 of Jones Day's expenses were incurred on matters funded by the First Lien Lenders and (c) $293,459 of Capstone's expenses were incurred on matters funded by the First Lien Lenders.

*Section 554 of the Bankruptcy Code, Bankruptcy Rule 6007 and Local Bankruptcy Rule 6007-1,*

*Authorizing the Abandonment of Old Carco Liquidation Trust's Ownership Interests in*

*Nondebtor Bonsol Holding S.a.r.l.* (Docket No. 8359) (approving the abandonment of the

Liquidation Trust's equity ownership in an entity through which the Liquidation Trust owned

Alpha).  <u>See</u> Case Closing Motion, at n.3; ¶ 7; Final Report, attached as Annex A to the Case

Closing Motion, at 17.

        4.       Immediately prior to the Effective Date, all remaining assets of the Closed

Debtors were transferred to the Liquidation Trust, which, as set forth in the Case Closing

Motion, has substantially completed the work of (a) managing such assets in accordance with the

Plan, (b) making the distributions on account of Allowed Claims (as set forth in the Plan) and

(c) otherwise administering the implementation of the Plan.

Dated:  June 18, 2015
        New York, New York

Respectfully submitted,

/s/ Corinne Ball_____
Corinne Ball
Veerle Roovers
JONES DAY
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Jeffrey B. Ellman
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309
Telephone:  (404) 581-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR
OLD CARCO LIQUIDATION TRUST

# **EXHIBIT D**

**Proposed Final Decree**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                               :
In re                                          :   Chapter 11
                                               :
Old Carco LLC                                  :   Case No. 09-50002 (SMB)
(f/k/a Chrysler LLC), et al.,                  :
                              Debtors.         :   (Jointly Administered)
                                               :
                                               :
------------------------------------------------------------x
```

### FINAL DECREE, PURSUANT TO SECTION 350 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3022 AND LOCAL BANKRUPTCY RULE 3022-1, (A) CLOSING THE CHAPTER 11 CASES OF OLD CARCO LLC AND ALPHA HOLDING LP, (B) TERMINATING THE APPOINTMENT OF THE CLAIMS AND NOTICING AGENT, (C) GRANTING RELEASES AND (D) GRANTING RELATED RELIEF

This matter coming before the Court on the *Motion of Old Carco Liquidation Trust for the Entry of a Final Decree, Pursuant to Section 350 of the Bankruptcy Code, Bankruptcy Rule 3022 and Local Bankruptcy Rule 3022-1, (A) Closing the Chapter 11 Cases of Old Carco LLC and Alpha Holding LP, (B) Terminating the Appointment of the Claims and Noticing Agent, (C) Granting Releases and (D) Granting Related Relief* (the "Motion"),[1] filed by Old Carco Liquidation Trust (the "Liquidation Trust"); the Court having reviewed the Motion; the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Article VIII.A of the Plan, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) notice of the Motion was sufficient under the circumstances and in full compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Confirmation Order and the Plan and (d) the Liquidation Trust has accomplished the substantial consummation of the Debtors' cases and substantially completed the administration and

---

[1]     Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

implementation of the Plan, thereby warranting the relief granted herein; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein;

IT IS HEREBY ORDERED THAT:

1.      The chapter 11 cases of Old Carco (Case No. 09-50002) and Alpha (Case

No. 09-50025) are hereby closed, pursuant to section 350 of the Bankruptcy Code, Bankruptcy

Rule 3022 and Local Bankruptcy Rule 3022-1.  Without limiting the foregoing, (a) the Pending

Adversary Proceedings and the Pending Contested Matters shall be unaffected by the closing of

the chapter 11 cases and shall remain pending until finally adjudicated or resolved; and (b) the

Liquidation Trust shall retain the right to seek to reopen the chapter 11 case of any one or more

of the Debtors, for cause, pursuant to section 350(b) of the Bankruptcy Code.

2.      The Liquidation Trust is hereby authorized to make the remaining

disbursements and distributions, including as described in the Motion, the Final Report,

the Winddown Orders and any order granting the Fee Motion, and to complete its other activities

as determined by the Liquidation Trustee to be consistent with the Plan, the Confirmation Order

and the Liquidation Trust Agreement.  Nothing herein shall be deemed to expand, limit or

otherwise modify any rights or duties of the Liquidation Trust or the Liquidation Trustee under

the Plan, the Confirmation Order or the Liquidation Trust Agreement.

3.      The appointment of Epiq as claims and noticing agent in these cases shall

be terminated, effective upon, and subject to, Epiq's completion of (a) service of this Final

Decree and (b) the proper packaging and delivery of original documents to the Federal Archives,

if necessary, as determined and directed by the Clerk of the Court.  Without limiting the

foregoing, Epiq is hereby further directed, as an obligation surviving the termination of its

appointment in these cases, to comply as promptly as reasonably possible with any requests by

the Clerk of the Court for additional transfer and/or preservation of any public, nonconfidential,

nonprivileged documents associated with these cases.

    4.  The Liquidation Trustee, the Liquidation Trust and their respective

directors, managers, officers, employees, agents, professionals and other representatives

(collectively, the "Liquidation Trust Parties") are hereby released and exculpated from all

liability on account of any acts or omissions in connection with (a) the Chapter 11 Cases;

(b) the winddown of the Estates and administration of the Liquidation Trust Assets; and

(c) the implementation of the Plan, the Confirmation Order, the Liquidation Trust Agreement,

the Winddown Orders, the other Plan Exhibits and any other orders of this or other courts,

*provided* in each case that such acts or omissions are not determined by a Final Order to have

constituted willful misconduct or gross negligence (the "Liquidation Trust Party Release").  For

the avoidance of doubt, the Liquidation Trust Party Release is in addition to, and does not

modify, limit or otherwise affect, the Limitation of Liability Provision or any other protections

afforded to the Liquidation Trust Parties in or by the Liquidation Trust Agreement, the Plan or

any other document, statute, rule or common law (including, without limitation, any release,

exculpation, injunction or indemnification).

    5.  Upon the termination of the Liquidation Trust and with no further order of

the Court, the Liquidation Trust and the Liquidation Trustee shall be discharged and relieved of

all further duties or obligations in connection with the Chapter 11 Cases, the Plan,

the Confirmation Order, the Liquidation Trust Agreement, the Winddown Orders or any other

Plan Exhibit or related document, except as expressly provided to the contrary in Section 12.4 of

the Liquidation Trust Agreement.

6.      The Liquidation Trust, Epiq and the Clerk of the Court are authorized to

take any and all actions that are necessary or appropriate to give effect to and implement this

Final Decree.  Without limiting the foregoing, the Clerk of the Court is hereby directed to close

the resolved adversary proceedings listed on <u>Annex 1</u> attached hereto.

7.      This Court shall retain jurisdiction over each of the Pending Adversary

Proceedings and the Pending Contested Matters and any and all matters arising from or related to

the interpretation, implementation and/or enforcement of this Final Decree.


Dated: _____, 2015        _____

                                                     UNITED STATES BANKRUPTCY JUDGE

## ANNEX 1

### List of Resolved Adversary Proceedings to Be Closed

Old Carco Liquidation Trust, *et al*. v. Daimler AG *et al*., Adv. Pro. No. 09-00505-smb

Miller, *et al*. v. Daimler AG, *et al*., Adv. Pro. No. 10-05001-smb

Cooper, *et al*. v. Daimler AG, *et al*., Adv. Pro. No. 10-05002-smb

Cole, *et al*. v. Daimler AG, *et al*., Adv. Pro. No. 10-05003-smb

Cooper, *et al*. v. Daimler AG, *et al*., Adv. Pro. No. 10-05004-smb

Monk, *et al*. v. Daimler AG, *et al*., Adv. Pro. No. 10-05005-smb

Wolff, *et al*. v. Chrysler Group LLC, *et al*., Adv. Pro. No. 10-05007-smb

Old Carco LLC, *et al*. v. Suthers, *et al*., Adv. Pro. No. 10-05010-smb

Hayes, *et al*. v. Chrysler Group LLC *et al*., Adv. Pro. No. 11-09405-smb

Mr. Z Towing Inc., *et al*. v. Don Glo Auto Service Center *et al*., Adv. Pro. No. 11-09408-smb

Old Carco Liquidation Trust, *et al*. v. Testa, *et al*., Adv. Pro. No. 11-09410-smb

Tatum, *et al*. v. Chrysler Group LLC, *et al*., Adv. Pro. No. 11-09411-smb

Burton, *et al*. v. Chrysler Group LLC, Adv. Pro. No. 13-01109-smb

Sculfort, *et al*. v. Chrysler Group LLC, Adv. Pro. No. 13-01317-smb

Hartsel, *et al*. v. Chrysler Group LLC, *et al*., Adv. Pro. No. 13-01335-smb

James and Felicia Ricks v. Chrysler Group LLC, *et al*., Case No. 10-cv-09674 (S.D.N.Y.) (pending transfer to the Bankruptcy Court per District Court Docket Nos. 22, 23)